Nos. 23-1719, 23-1941, & 23-1959 (Con.)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JULIAN OMIDI,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Central District of California
No. 2:17-cr-00661
Hon. Dolly M. Gee

## APPELLANTS' JOINT OPENING BRIEF

Lawrence S. Robbins
Jeffrey C. Fourmaux
Priyanka Wityk
Alexandra Elenowitz-Hess
FRIEDMAN KAPLAN SEILER
ADELMAN & ROBBINS LLP
7 Times Square
New York, NY 10036
212-833-1100

*Attorneys for Defendant-Appellant*
*Julian Omidi*

Elon Berk
GUROVICH BERK & ASSOCIATES
15250 Ventura Boulevard, Suite1220
Sherman Oaks, CA 91403
818-205-1555

*Attorneys for Defendant-Appellant*
*Surgery Center Management, LLC*

# DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1(a), Surgery Center Management, LLC asserts that it has no parent corporation and there is no publicly held corporation that owns ten percent or more of its stock.

Dated:  November 21, 2023

GUROVICH BERK & ASSOCIATES

/s/ *Elon Berk*
Elon Berk

*Attorneys for Defendant-Appellant*
*Surgery Center Management, LLC*

i

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ...................................................................i

TABLE OF AUTHORITIES ...............................................................iv

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT .........................................................2

ISSUES PRESENTED.............................................................................2

STATEMENT OF THE CASE.................................................................4

    A.    The Government's Case ...........................................................4

    B.    The Defense Case.................................................................12

    C.    The Verdict and Subsequent Proceedings...........................16

SUMMARY OF THE ARGUMENT .......................................................16

STANDARD OF REVIEW ....................................................................18

ARGUMENT ........................................................................................20

I.     DISMISSAL, OR AT MINIMUM A NEW TRIAL, IS
      WARRANTED ON MATERIALITY GROUNDS. ....................20

    A.    The Government Failed to Prove Materiality. ....................20

    B.    The District Court Erred in Permitting the Government to Elicit
        Whether the Insurers Would Have "Investigated" Further Had
        They Known of Some Falsity in the Claims. .......................24

II.    APPELLANTS ARE ENTITLED TO A NEW TRIAL BASED ON
      ERRONEOUS JURY INSTRUCTIONS. ....................................28

    A.    The "Reckless Indifference" Instruction Was Legally
        Erroneous.............................................................................28

    B.    The "Willful Blindness" and "Reckless Indifference"
        Instructions Constructively Amended the Indictment. .......38

ii

III.    APPELLANTS ARE ENTITLED TO A NEW TRIAL BASED ON ERRONEOUS EVIDENTIARY RULINGS.................................................46

    A.    The Zarrabi Reports Were Not Admissible Under FRE 803(6). ........46

    B.    The District Court Erroneously Admitted Petron's "Loss" Testimony..........................................................................................58

    C.    The Oxman Statements Were Erroneously Admitted on the False Premise that Oxman Was Omidi's Agent...................................62

IV.    THE FORFEITURE AND RESTITUTION AWARDS SHOULD BE REVERSED..............................................................................66

    A.    The District Court Erred in Awarding Forfeiture. ............................66

        1.    The government was required to prove that no revenue would have been obtained, directly or indirectly, by Appellants "but for" the commission of the mail and wire fraud offense. ....................................................................68

        2.    The government failed to show that all the revenue received by SCM was forfeitable...............................................70

    B.    The District Court Erred in Ordering Appellants to Pay Restitution for Sleep Studies and CPAP Equipment .........................77

        1.    The insurers are not "victims" under the MVRA and, therefore, are not entitled to restitution.....................................77

        2.    The government failed to prove "actual loss" because it never offered the Plans that defined which claims would not have been covered "but for" the fraud....................79

        3.    The district court erred in granting restitution where there was no causal connection to the offense or any criminal conduct.........................................................................81

CONCLUSION ........................................................................................85

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Borden v. United States*,
  141 S. Ct. 1817 (2021).................................................29, 32, 33, 35

*Daubert v. Merrell Dow Pharms., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) ..............................................61

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)...........................................................61

*Dudley v. Duckworth*,
  854 F.2d 967 (7th Cir. 1988) ..............................................66

*Farmer v. Brennan*,
  511 U.S. 825 (1994)......................................................35, 36

*Global-Tech Appliances, Inc. v. SEB S.A.*,
  563 U.S. 754 (2011).................................................32, 34, 35

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010) ..............................................48

*Irwin v. United States*,
  338 F.2d 770 (9th Cir. 1964) ..............................................31

*Jeffers v. United States*,
  392 F.2d 749 (9th Cir. 1968) ..............................................46

*Kungys v. United States*,
  485 U. S. 759 (1988)................................................20, 25, 26, 27

*Neder v. United States*,
  527 U.S. 1 (1999)................................................................20

*No Casino in Plymouth v. Nat'l Indian Gaming Comm'n*,
  2023 WL 4646113 (9th Cir. July 20, 2023) ......................32

*Stirone v. United States*,
  361 U.S. 212 (1960)............................................................41

iv

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) .................................................................................79

*United States v. Abaji*,
    820 F. App'x 544 (9th Cir. 2020) ........................................................31

*United States v. Adamson*,
    291 F.3d 606 (9th Cir. 2002) ...........................................18, 44, 45, 46

*United States v. Alvarez*,
    617 F.3d 1198 (9th Cir. 2010) .............................................................20

*United States v. Bailey*,
    696 F.3d 794 (9th Cir. 2012) ...............................................................19

*United States v. Beecroft*,
    608 F.2d 753 (9th Cir. 1976) ...............................................................31

*United States v. Bonds*,
    608 F.3d 495 (9th Cir. 2010) .........................................................64, 65

*United States v. Bussell*,
    414 F.3d 1048 (9th Cir. 2005) .............................................................80

*United States v. Catoggio*,
    326 F.3d 323 (2d Cir. 2003) ................................................................78

*United States v. Choy*,
    309 F.3d 602 (9th Cir. 2002) ...............................................................41

*United States v. Christensen*,
    828 F.3d 763 (9th Cir. 2015) ...............................................................69

*United States v. Cisneros*,
    825 F. App'x 429 (9th Cir. 2020) ........................................................65

*United States v. Curtin*,
    489 F.3d 935 (9th Cir. 2007) (en banc) ..............................................19

*United States v. Cusino*,
    694 F.2d 185 (9th Cir. 1982) ...............................................................32

v

*United States v. Davis,*
854 F.3d 601 (9th Cir. 2017) ..........................................................38, 40, 41, 42

*United States v. Dearing,*
504 F.3d 897 (9th Cir. 2007) .................................................................29, 31

*United States v. Dipentino,*
242 F.3d 1090 (9th Cir. 2001) .......................................................................41

*United States v. Farris,*
614 F.2d 634 (9th Cir. 1979) .........................................................................32

*United States v. Fu Sheng Kuo,*
620 F.3d 1158 (9th Cir. 2010) ......................................................................19

*United States v. Gaudin,*
515 U.S. 506 (1995)......................................................................................20

*United States v. Gay,*
967 F.2d 322 (9th Cir. 1992) ....................................................................29, 31

*United States v. Gracidas-Ulibarry,*
231 F.3d 1188 (9th Cir. 2000) (en banc) .....................................................32, 33

*United States v. Hendershot,*
614 F.2d 648 (9th Cir. 1980) .........................................................................77

*United States v. Heredia,*
483 F.3d 913 (9th Cir. 2007) (en banc) ....................................................*passim*

*United States v. Hitt,*
981 F.2d 422 (9th Cir. 1992) .........................................................................62

*United States v. Jewell,*
532 F.2d 697 (9th Cir. 1976) (en banc) ...........................................32, 33, 34, 35

*United States v. Katakis,*
800 F.3d 1017 (9th Cir. 2015) ......................................................................18

*United States v. Lester,*
85 F.3d 1409 (9th Cir. 1996) .........................................................................19

vi

*United States v. Litvak*,
   808 F.3d 160 (2d Cir. 2015) ........................................................27, 28

*United States v. Lloyd*,
   807 F.3d 1128 (9th Cir. 2015) .....................................................36, 44

*United States v. Love*,
   535 F.2d 1152 (9th Cir. 1976) ...........................................................44

*United States v. Martin*,
   2014 WL 221956 (D. Idaho Jan. 21, 2014) ........................................69

*United States v. Miller*,
   953 F.3d 1095 (9th Cir. 2020) .....................................................30, 32

*United States v. Morton*,
   2022 WL 17076203 (9th Cir. Nov. 18, 2022) ....................................33

*United States v. Pollard*,
   850 F.3d 1038 (9th Cir. 2017) ...........................................................19

*United States v. Prasad*,
   18 F.4th 313 (9th Cir. 2021) .......................................................73, 74

*United States v. Rios*,
   611 F.2d 1335 (10th Cir. 1979) .........................................................64

*United States v. Rodriguez*,
   880 F.3d 1151 (9th Cir. 2018) ...........................................................36

*United States v. Romo-Romo*,
   246 F.3d 1272 (9th Cir. 2001) .....................................................18, 36

*United States v. Rutgard*,
   116 F.3d 1270 (9th Cir. 1997) ...........................................................77

*United States v. Shipsey*,
   190 F. 3d 1081 (9th Cir. 1999) .............................................42, 43, 44

*United States v. Taylor*,
   142 S. Ct. 2015 (2022) .......................................................................56

*United States v. Torres,*
    794 F.3d 1053 (9th Cir. 2015) ........................................................63

*United States v. Tsinhnahijinnie,*
    112 F.3d 988 (9th Cir. 1997) ..........................................................38

*United States v. Tydingco,*
    909 F.3d 297 (9th Cir. 2018) ..........................................................36

*United States v. Waknine,*
    543 F.3d 546 (9th Cir. 2008) ....................................................19, 78

*United States v. Ward,*
    747 F.3d 1184 (9th Cir. 2014) ......................................18, 40, 41, 44

*United States v. Williams,*
    685 F.2d 319 (9th Cir. 1982) ..........................................................33

*United States v. Yates,*
    16 F.4th 256 (9th Cir. 2021) ...........................................................30

*United States v. Yi,*
    704 F.3d 800 (9th Cir. 2013) ..........................................................35

*West v. United States,*
    68 F.2d 96 (10th Cir. 1933) ......................................................31, 32

**Statutes**

18 U.S.C. § 664 ..................................................................................42

18 U.S.C. § 981(a)(1)(C) ...................................................................68

18 U.S.C. § 981(a)(2)(A) .............................................................68, 69

18 U.S.C. § 1028A(a)(1) ......................................................................5

18 U.S.C. § 1031 .................................................................................27

18 U.S.C. § 1035 ...................................................................................5

18 U.S.C. § 1341 .............................................................................5, 68

18 U.S.C. § 1343 .............................................................................5, 68

18 U.S.C. § 1591(a) ........................................................................42

18 U.S.C. § 1956(a)(1)(A) ...............................................................5

18 U.S.C. § 1956(h) ..........................................................................5

18 U.S.C. § 3231 ...............................................................................2

18 U.S.C. § 3571(d) ........................................................................77

18 U.S.C. § 3663A(a)(2) ....................................................78, 79, 81

18 U.S.C. § 3663A(c)(1)(B) ...........................................................77

28 U.S.C. § 1291 ...............................................................................2

28 U.S.C. § 2461(c) ...........................................................68, 69, 71

Mandatory Victims Restitution Act, 18 U.S.C. § 3663A ................*passim*

**Rules**

Fed. R. App. P. 4(b)(1)(A)(i) ...........................................................2

Fed. R. Crim. P. 29..........................................................................19

Fed. R. Crim. P. 32.2(b)(1)(A) .......................................................69

Fed. R. Evid. 104(a) ........................................................................64

Fed. R. Evid. 801(c).........................................................................47

Fed. R. Evid. 803(6)....................................................................*passim*

Fed. R. Evid. 806 .............................................................................56

**Other Authorities**

Centers for Medicare & Medicaid Servs., NCD, Pub. No. 100-3,
    Manual Sec. No. 240.4, "Continuous Positive Airway Pressure
    (CPAP) Therapy for Obstructive Sleep Apnea (OSA)" (effective
    Mar. 13, 2008), *available at* https://www.cms.gov/medicare-
    coverage-database/view/ncd.aspx?ncdid=226&
    ncdver=3&chapter=all&sortBy=title&bc=18 (last visited Nov. 20,
    2023) ..........................................................................................23

FDA, Summary of Safety & Effectiveness (Feb. 16, 2011),
https://www. accessdata.fda.gov/cdrh_docs/pdf/p000008s017b.pdf
(last visited Nov. 20, 2023).................................................................22

Merriam-Webster Dictionary, "Intent",
*available at* https://www.merriam-webster.com/dictionary/intent
(last visited Nov. 20, 2023).................................................................29

Model Penal Code § 2.02....................................................29, 33, 34, 35

NIH, Calculate Your Body Mass Index,
https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmical
c.htm.................................................................................................53

x

## INTRODUCTION

Following a vigorously contested jury trial, Appellants—Surgery Center Management, LLC ("SCM") and Julian Omidi, an SCM contractor—were convicted on charges arising from an alleged scheme to submit false insurance-coverage claims for surgery and other weight-loss services for obese patients.  The judgments stand or fall on the following legal propositions:

- May the government prove the materiality of purported misrepresentations without introducing the insurance plans that governed whether a given claim was covered?

- May the government prove *both* knowledge *and* intent to defraud merely by showing that Appellants were "recklessly indifferent" to the truth of insurance claims?

- May the government prove Omidi's knowledge based on conscious avoidance (or, even worse, reckless indifference) when the grand jury alleged *only* that Omidi had *actual* knowledge and personally directed every step in the alleged scheme?

- May hearsay documents be admitted as business records where the custodian did not testify, no other witnesses knew how the documents were created, and the sources of the records and circumstances of their creation were uniformly disparaged as unreliable?

- May the government offer, in the liability phase of a criminal trial, the amount of "intended" and "actual" losses, where the loss calculation is based on inadmissible documents, the methodology for determining loss is hopelessly over-inclusive, and the amount of the losses is irrelevant to "actual knowledge," the only scienter theory alleged in the indictment?

- Are a third party's threats against government witnesses admissible against Appellants on the ground that the third party was Omidi's "agent," absent evidence that the declarant was subject to Omidi's control?

- May a court direct the forfeiture of every dollar received by SCM simply because patients contacted the company through a "call center" and thereafter *some* (but not nearly all) of those patients were the subject of allegedly falsified claims?

If the answer to even one of these questions is "no," the judgments must be vacated. As shown below, the answer to *every one* of these questions is "no."

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291. Omidi and SCM appeal from amended judgment and probation/commitment orders entered against them on August 1 and 16, 2023, respectively (1-ER-5, 10) and from a money judgment of forfeiture entered on August 21, 2023 (1-ER-2). Omidi filed notices of appeal on August 7 and 23, 2023. 51-ER-10116, 10122. SCM filed its notice of appeal on August 22, 2023. 51-ER-10119. The appeals are timely under FRAP 4(b)(1)(A)(i). The appealed judgments dispose of all parties' claims.

Omidi is on bail pending appeal until May 1, 2024. 1-ER-10.

## ISSUES PRESENTED

I. Whether Appellants' convictions should be reversed, or at least a new trial ordered, on materiality grounds.

II. Whether Appellants are entitled to a new trial due to the district court's instructional errors:

2

A.   The jury was instructed that it could find *both* knowledge *and* intent to defraud if it concluded that Omidi was "recklessly indifferent" to misrepresentations.

B.   The instructions on conscious avoidance and reckless indifference constructively amended the indictment.

III.  Whether Appellants are entitled to a new trial due to the district court's evidentiary errors:

A.   Critical documents were admitted under Fed. R. Evid. 803(6) but there was no "qualified witness" to lay a foundation, and the evidence showed the documents to be utterly unreliable.

B.   The court admitted the "intended" and "actual" losses supposedly associated with the scheme, where (i) the calculation rested on inadmissible evidence; (ii) the assumptions underpinning the loss calculation was misleading; and (iii) the amount of loss was irrelevant to whether Appellants had "actual knowledge."

C.   The district court admitted threatening statements made by a third party on the unproven premise that the declarant was Omidi's "agent."

IV.  Whether the forfeiture and restitution awards were erroneous.

3

## STATEMENT OF THE CASE

### A.    The Government's Case

Omidi helped to operate SCM (47-ER-9417), which provided weight-loss services to obese patients.  Among those services was Lap-Band surgery, a medical procedure by which a band is surgically implanted around the stomach, stanching the patient's appetite and assisting in weight loss.  10-ER-1992, 19-ER-3938.

To qualify for Lap-Band surgery, a patient typically presented with a high Body Mass Index ("BMI"), a function of weight and height.  If the patient's BMI was 40 or above, insurance companies generally covered Lap-Band surgery, regardless of whether the patient also suffered from "co-morbidities."  10-ER-1996.  For patients whose BMIs fell between 35 and 40, insurers would cover Lap-Band claims if the patient also suffered from a designated co-morbidity, such as hypertension or diabetes.  10-ER-1996, 2138-40.

Another such co-morbidity is sleep apnea, a disorder that causes patients momentarily to stop breathing while sleeping.  10-ER-1996.  At the direction of the company's physicians, SCM required all new patients to take a sleep study (a "polysomnogram" or "PSG") to assess the presence and severity of sleep apnea.  19-ER-3954, 3958-59; 45-ER-9021; 4-ER-894.  Using electrodes attached to the patient, technicians would gather "raw data" as a patient slept, then provide that data to the registered polysomnographic technologist ("RPSGT"), Michael Zarrabi,

4

whose job was to calculate a draft Apnea-Hypopnea Index ("AHI"). 9-ER-1819, 1865; 14-ER-2996, 3008-10. A sleep specialist, Dr. Mirali Zarrabi ("Dr. Zarrabi"), Michael Zarrabi's brother, then reviewed the draft calculations and provided a final report with a diagnosis. 22-ER-4763; 28-ER-5671; 29-ER-5756-58, 5789-93; 31-ER-6161-64, 6248-51; 4-ER-898, 908. An AHI of 0-4.9 events per hour indicated no sleep apnea; 5-14.9 meant mild apnea; 15-29.9 covered moderate apnea; and 30+ was severe. 45-ER-9076. SCM generally scheduled patients to also take a second sleep study to calibrate a device, such as a continuous positive airway pressure ("CPAP") machine, designed to counteract sleep apnea (8-ER-1657; 9-ER-1805).

The government indicted Omidi and SCM, along with Dr. Zarrabi (who was ultimately acquitted), on a range of charges: mail and wire fraud (18 U.S.C. §§ 1341, 1343), false statements relating to health care matters (*id.* § 1035), aggravated identity theft (*id.* §1028A(a)(1)), and conspiracy to commit promotional money laundering (*id.* §§ 1956(a)(1)(A), 1956(h)). The identity theft and money laundering counts were predicated on the mail fraud, wire fraud, and false statements counts, each of which required the government to prove materiality, knowledge, and intent.

The centerpiece of the government's case against Appellants was the testimony of Charles Klasky, SCM's sleep study manager. According to Klasky,

5

Omidi had directed him, through a series of cryptic Post-It notes and uncorroborated conversations, to increase the AHI scores in sleep study reports to suggest that patients had sleep apnea when they did not, or more severe apnea than they did. 4-ER-908; 29-ER-5801; 35-ER-6985. Klasky claimed that he thereby created false claims for sleep study reimbursement, CPAP machines, and Lap-Band surgery. 6-ER-1285-87.

Dr. Zarrabi's final reports were stored on an FTP site. 4-ER-908; 35-ER-6987-88. But the government unaccountably neglected to serve a preservation request, subpoena, or search warrant on the company hosting the FTP site, and as a result the host destroyed Dr. Zarrabi's diagnostic reports in the normal course of its business. 48-ER-9626-28. So, the government chose to treat Michael Zarrabi's *draft* AHI figures as if they reflected the *true* and *final* sleep study results. 22-ER-4557; 46-ER-9122-23. Beginning with that false premise, the government then juxtaposed the "real" AHI scores (created by Michael Zarrabi) to the "falsified" AHI scores (created by Klasky and submitted to the insurers). Any difference between those two sets of AHI scores, the government contended, proved that Appellants' submissions to the insurers were false. 49-ER-9726-27.

And things went downhill from there. To show that the draft Michael Zarrabi reports were indeed *true* (and thus any departure from those drafts were false), the government had to admit the Michael Zarrabi drafts *for their truth*. That

6

was no easy task. At the time of trial (and almost certainly at the time he worked at SCM), Michael Zarrabi suffered from bipolar disorder, experienced "paranoid delusions," was undergoing electric shock therapy, and had been taking anti-psychotic medications to address his sense that "the CIA was following" him and that there were "tiny cameras in the corners of room[s]." 4-ER-895; 20-ER-4294; 43-ER-8584. The government therefore chose not to call Michael Zarrabi to testify at trial. 18-ER-3661-62.

So, the government sought to lay the requisite foundation through other witnesses. Following extensive legal argument, the trial court admitted Michael Zarrabi's reports (the "Zarrabi Reports," often referred to by their Bates prefix, "GT_MZ") as "business records" under Fed. R. Evid. 803(6). In the district court's view, it was sufficient that the Zarrabi Reports were "a regularly created type of document used by this business in conducting its business." 41-ER-8323-24. The court also found the Zarrabi Reports "trustworthy" because "trustworthy means that it's a regularly created type of document used by this business in conducting its business. Whether that information on that document is always true and correct is not the issue." *Id.*

The government next had to show that Appellants *knew* the coverage claims were false. Whereas the First Superseding Indictment ("FSI") alleged (only) that Omidi had *actual* knowledge of the false claims and personally directed the

7

scheme (FSI [2-ER-514], ¶¶ 37-38, 43, 45, 47, 49, 53-55, 57), at trial the

prosecutors sought and were given a second path to conviction: willful blindness.

Over a constructive-amendment objection (47-ER-9329), the government offered

evidence and argument that Omidi had consciously avoided learning the truth (29-

ER-5849-50; 49-ER-9737). As the prosecution put it in the rebuttal summation,

"Julian Omidi wants you to think that he didn't have any suspicions." 50-ER-

10029.

The government then persuaded the district court to dilute the mens rea

standard still further. Again over objection (47-ER-9332-36), the trial court told

the jury that *both* knowledge *and* intent to defraud may "be shown if the

defendants acted with *reckless indifference* to the truth or falsity of their

statements." 49-ER-9705 (emphasis added). The trial court (once more at the

government's request and over objection (2-ER-485-86) declined to define

"recklessness" for the jury. The government then capitalized on the instruction,

both in its opening summation and in rebuttal. 48-ER-9506; 49-ER-9737-39; 50-

ER-10019-20; *see also* 48-ER-9596.

The government also offered incendiary evidence to prove that Omidi

possessed the requisite scienter. The government first elicited from Klasky that

Brian Oxman—a former lawyer who had worked with Omidi and others—had

threatened Klasky that "meeting with the government … would be the same thing

8

as if [you] were to put a gun to [your] head and just kill [your]self." 30-ER-6045-

46.  Based on a showing that sometime before the threatening call, Klasky had

seen Oxman and Omidi leaving a building together; that Oxman "at one time" had

been a lawyer; and that Oxman had "appear[ed]" to "work closely" with Omidi,

the district court found that Oxman was Omidi's agent at the time of the call and

therefore admitted the Oxman threat against Omidi.  30-ER-6044-45.  The court

also declined to give a limiting instruction that Oxman's statement was not

intended as a death threat.  30-ER-6047-50.

      The government next elicited from Jaffy Palacios, a former employee, that

Oxman had (successfully) urged Palacios to perjure himself before the grand jury

(44-ER-8736-37) and again (perhaps less successfully) at trial (44-ER-8761-62).

Noting its prior agency finding, the district court admitted these subornation efforts

against Omidi.  43-ER-8628-39.  The prosecution also elicited from yet another

witness, Larry Twersky, that Oxman had threatened him with a defamation lawsuit

if he complained about AHI scoring.  37-ER-7416.

      Finally, the government was required to prove that Appellants' alleged

misrepresentations were material.  49-ER-9697.  To do so, the government called

(or offered via stipulation) several fraud investigators from the insurers that paid

SCM claims (the "Materiality Witnesses").

Chief among these was Carl Reinhardt, from Anthem Blue Cross of California.  10-ER-1979.  Reinhardt explained, at the outset, the crucial difference between the insurance companies' *internal coverage policies* and the individual insurance contracts (*the "Plans"*) that provide the actual terms and conditions of coverage.  As Reinhardt noted, "most of us … get our insurance through our employer groups.  And so it's those employer groups that set the limits as to what benefits they offer."  10-ER-1992.  Indeed, Reinhardt noted, "over half of the people that we say are Anthem insured are actually insured through their own employer," and thus it is "the employer"—not the insurer—"that decides what coverage their employers are going to receive."  10-ER-1995.  Even where Anthem itself was providing the coverage, "the employer can negotiate with Anthem to provide different kinds of coverage" (10-ER-2068) and may choose to cover claims that fall outside a given policy (10-ER-2069).  As a former SCM nutritionist agreed, "[y]ou could have 100 different people with 100 different permutations and … types of insurance requirements."  14-ER-2955.

Accordingly, Reinhardt conceded, "[w]ithout looking at th[e] particular medical plan that covered [a given patient], there is no way to know what specifically is, in fact, covered and under what circumstances it's covered."  10-ER-2072-73; *see* 10-ER-2119-20 (same); 41-ER-8256 (Lisa LeGare, Health Net investigator; agreeing that "patient's health insurance plan," not "Health Net's

10

policy," "govern[s] whether a particular patient is covered for a particular procedure"); 14-ER-2853-54 (Kathy Richer, Aetna representative; agreeing that "[w]ithout looking at the particular patient's summary plan description, you cannot know under what circumstances a sleep study or lap band surgery would be covered"). As former SCM dietitian (20-ER-4214) Jessica Meyle agreed, "regardless of what insurance companies said initially about whether there is coverage, … you would need to look at the actual summary plan description." 21-ER-4333.

Because they were unfamiliar with the "thousands of different health insurance plans that a particular patient may have" (10-ER-2060), the Materiality Witnesses could generally provide only a "high level" sense of *the insurer's* medical policy—which, as the witnesses acknowledged, would be trumped by "the specific health insurance contract language." 10-ER-1996, 2063-64; *see* 41-ER-8267 (Health Net's LeGare testifying that, if there is any conflict, "the contract would prevail" over "Health Net's policy"). Tellingly, however, with but a single possible exception (which did not support the government's position), the government never offered any of the controlling Plans at trial. So, when the government asked the Materiality Witnesses whether an alleged SCM falsity was "material," all they could generally address was whether a purported lie would have made a difference *under internal insurer policy*.

11

### B.     The Defense Case

Appellants vigorously contested the charges at trial.  According to the

defense, Klasky was woefully incompetent.  Desperate to prove his value as a sleep

study manager and keep his job, having been fired from his last (30-ER-6077),

Klasky set out to ensure that the program matched the diagnosis rate he had

previously advised Omidi to expect.  Klasky altered AHI results on his own, not

because of any Omidi directive.

The evidence to this effect came in droves.  Klasky was indisputably in

charge of the sleep study program.  8-ER-1662; 9-ER-1811.  He sent memos and

bulletins on best practices, including to Omidi and others in management.  8-ER-

1645, 1661, 1674-75; 13-ER-2684-85.  He prepared the script presented to new

patients regarding the sleep study process.  8-ER-1664; 13-ER-2672.  He hired his

subordinates, including Michael Zarrabi.  9-ER-1899-900.  He trained the sleep

study staff (14-ER-3005-06) and was the "head of the program," according to his

various reports (8-ER-1713; 9-ER-1809-10, 1910-11).

Equally indisputably, Klasky was flailing at the job.  As one of Klasky's

direct reports confirmed, the sleep study program was a "chaotic" place to work,

not least because "Klasky was not the kind of person to do a lot of work."  13-ER-

2724-25.  Klasky suffered from bipolar disorder, insomnia, and depression—

illnesses that afflicted him during his tenure at SCM.  29-ER-5868-69; 35-ER-

12

6921-22. He had advised his physician that he could "no longer rely on [his] memory." 35-ER-6925. He concededly lied about his qualifications on a series of employment applications. 31-ER-6189-91, 6193-94, 6205-06. And losing his job at SCM, Klasky admitted, would have been devastating for a middle-aged man with a checkered career and substantial medical expenses. 29-ER-5870.

Klasky's alterations of the Zarrabi AHIs were often pointless or downright counter-productive, and thus unlikely to have been part of an Omidi-directed conspiracy. Sometimes Klasky chose a *lower* AHI. 32-ER-6337, 6340-41, 6343, 6354-56, 6358-67; *see also* 32-ER-6335-37. Sometimes he raised the AHI without affecting the apnea severity. 32-ER-6368-70, 6376, 6378. With considerable frequency, he altered the Zarrabi AHIs even though the patient qualified for Lap-Band surgery on other grounds, such as a BMI over 40. *E.g.*, 21-ER-6378-79, 6381.

Klasky could not identify a single email or memo to corroborate the directives he supposedly received from Omidi. 32-ER-6505-06; 33-ER-6665, 6673. All he could point to were unverified conversations and a series of Post-It notes that Omidi had supposedly affixed to patient files bearing cryptic statements like "reweigh." 33-ER-6674. According to Klasky, this was a secret code, known only to himself and Omidi, directing him to increase the patients' recorded weight so that they could qualify for surgery. 29-ER-5822-24. Such a directive did *not*

13

simply mean, said Klasky, that Omidi wanted the patient to actually be "reweighed"—even though it "wasn't uncommon" for obese patients' weight to fluctuate from week to week and certainly from month to month. 48-ER-9528; *see, e.g.*, 44-ER-8816-21.[1] And Klasky was constrained to admit that a Post-It note just saying "sleep study" could simply have meant that no study had yet been performed, rather than a directive to artificially increase the Zarrabi AHI. 33-ER-6701.

Klasky's account was also impossible to square with much of his contemporaneous conduct. For example, he had told the scheme's supposed mastermind, Omidi, in the presence of another employee, Sherwin Hong, that PSGs often *needed* to be rescored to ensure AHI accuracy. 26-ER-5273. He had also told other SCM employees, such as Dr. Atul Madan, that he rescored sleep studies because he was skeptical of the AHI scores he had received. 20-ER-4118-19, 4125, 4127-28 (Dr. Madan persuaded by Klasky that rescoring was appropriate); 25-ER-5134-35 (Klasky advised Hong, Omidi, and others that rescoring was necessary due to "serious errors" in auto-scoring); 36-ER-7257. Klasky could not explain why, given his claim that Omidi had directed him to

---

[1] Sherwin Hong, the only other significant witness against Omidi, understood the "reweigh" notes to mean that Omidi actually wanted the patient to be reweighed. 22-ER-4743, 4746.

falsify AHI results, Omidi had *also* instructed him to hire a specialist like Dr. Neil Kline to evaluate sleep studies (31-ER-6147, 6153, 6159), and engage a third-party firm to score the sleep study reports independently (29-ER-5878-79). Even after a whistleblower brought attention to alterations in AHI results, Klasky repeatedly emailed Omidi and insisted that he was "running the sleep program correctly." 36-ER-7302, 7304-05; *see* 4-ER-881, 882, 884, 885, 887, 890, 891. In the end, Klasky acknowledged, "we're just going to have to rely on [his] word" for the scheme that he described. 33-ER-6665.

Hong, who, like Klasky, had pled guilty, was the only other significant witness against Omidi. He claimed that Omidi had directed him to change some BMIs just "two pounds up or two pounds down … because the weight fluctuates." 22-ER-4718; *see* 22-ER-4739, 23-ER-4783 (claiming Omidi said it was "okay to put, like, two pounds or less than two pounds on the evaluation"). But Hong, too, was subjected to a devastating cross-examination. He had previously told the government that Omidi had *never* told him to fabricate. 24-ER-4967, 4969. Indeed, Hong had struck from the second draft of his plea agreement the representation that Omidi had directed him to fabricate scores. 24-ER-4981. Hong also told the government that he'd taken his orders from Klasky, not Omidi. 24-ER-4990, 5006-07, 5010, 5017. Even in the grand jury, Hong could not recall Omidi ever telling him to add a pound or two to the patient's profile. 24-ER-5056.

15

## C. The Verdict and Subsequent Proceedings

Following a 51-day jury trial, Appellants were convicted on all counts against them. 2-ER-293. On April 24, 2023, the district court entered judgments sentencing Omidi to 84 months' imprisonment and three years' supervised release, and SCM to five years of probation. 1-ER-135, 140. On July 25, 2023, the district court ordered restitution in the amount of $11,207,773.96 and forfeiture of $98,280,221.44. 1-ER-16.

On August 1, 2023, an amended judgment was entered against Omidi providing for $11,207,773.96 in restitution and $98,280,221.44 in forfeiture. 1-ER-10. On August 16, 2023, an amended judgment was entered against SCM providing for restitution and forfeiture in the same amounts, plus a fine of $22,415,547.92. 1-ER-5. On August 21, 2023, the district court entered a separate money judgment of forfeiture against Appellants in the amount of $98,280,221.44 (1-ER-2), as provided in the amended judgments. Appellants timely appealed the judgments to this Court. 51-ER-10116, 10119, 10122.

## SUMMARY OF THE ARGUMENT

I. The materiality proof was insufficient, and the charges should be dismissed, or at a minimum a new trial should be ordered. Except in one instance (which actually shows immateriality), the government failed to offer any of the Plans, which dictate what is and isn't covered (and thus whether any putative

16

falsity would tend to affect the ultimate coverage decision). Moreover, the district court erroneously allowed the government to invite the jury to find materiality based solely on the fact that some insurers would have "investigated" further had they known of any falsity, even if, in the end, the claim would ultimately have been covered had the "true" facts been disclosed.

II.     Alternatively, a new trial is warranted due to the district court's erroneous jury instructions. The district court instructed the jury that "reckless indifference" suffices to prove *both* knowledge and intent to defraud, when, under dispositive Supreme Court and en banc Ninth Circuit cases, it proves *neither*. The instructions also constructively amended, or fatally varied from, the indictment by authorizing the jury to convict based on conscious avoidance (or, even worse, "reckless indifference"), when the "complex of facts" in the indictment alleged only that Omidi actually knew of the fraud and personally directed every step of it.

III.     The district court also wrongfully admitted critical evidence: the Zarrabi Reports, for which *none* of the Rule 803(6) predicates was established; "intended" and "actual" loss evidence that depended on the inadmissible Zarrabi Reports and which was irrelevant in any event; and threats against witnesses by a third party on the unproven premise that the third party was Omidi's agent.

IV.     The forfeiture and restitution awards should be vacated. The forfeiture award rests on the absurd premise that, because all SCM patients were

17

supposedly recruited through a "call center," every dollar of proceeds was forfeitable—despite the absence of any evidence or finding that the call center *itself* was fraudulent. The restitution awards are flawed because the insurers are not "victims" within the meaning of the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A; no "actual loss" was proven in the absence of the controlling Plans; and the sleep study- and CPAP-related awards were based on, at worst, simple negligence not charged as the "offense" in the indictment.

## STANDARD OF REVIEW

This Court reviews evidentiary sufficiency *de novo*, viewing the evidence in the light most favorable to the prosecution. *United States v. Katakis*, 800 F.3d 1017, 1023 (9th Cir. 2015).

An instruction challenged on legal grounds is subject to *de novo* review. *United States v. Romo-Romo*, 246 F.3d 1272, 1274 (9th Cir. 2001). If the instruction misstates an element of the crime, reversal is required "unless there is no reasonable possibility that the error materially affected the verdict or, in other words, that the error was harmless beyond a reasonable doubt." *Id.*

A constructive amendment claim is likewise reviewed *de novo*. *United States v. Ward*, 747 F.3d 1184, 1188 (9th Cir. 2014). If a constructive amendment occurred, it "always requires reversal." *United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002).

18

The admissibility of evidence is reviewed for abuse of discretion. *United States v. Curtin*, 489 F.3d 935, 943 (9th Cir. 2007) (en banc). For evidentiary errors, reversal is required "unless there is a 'fair assurance' of harmlessness or, stated otherwise, unless it is more probable than not that the error did not materially affect the verdict." *United States v. Bailey*, 696 F.3d 794, 803 (9th Cir. 2012).

This Court reviews legality of a forfeiture order *de novo*. *United States v. Pollard*, 850 F.3d 1038, 1041 (9th Cir. 2017). The forfeiture amount and factual findings are reviewed for clear error. *United States v. Lester*, 85 F.3d 1409, 1410-11 (9th Cir. 1996).

Similarly, legality of a restitution order is reviewable *de novo* and the amount of restitution for abuse of discretion. *United States v. Fu Sheng Kuo*, 620 F.3d 1158, 1162 (9th Cir. 2010). Factual findings are reviewed for clear error. *United States v. Waknine*, 543 F.3d 546, 555 (9th Cir. 2008).

Appellants challenged the sufficiency of the government's proof through a Rule 29 motion, which the district court denied. 2-ER-394; 47-ER-9277-86. Appellants objected to improper questions concerning materiality (4-ER-807, 866), and the district court ruled at 2-ER-398-99. Appellants' objections to the pertinent jury instructions are at 2-ER-414 and 47-ER-9326-36, and the district court's rulings thereon are at 47-ER-9327, 9330-31, and in the given instructions,

19

2-ER-331. Appellants objected to the Zarrabi Reports both before and during trial (3-ER-761; 4-ER-807, 810; 41-ER-8297-335), and the district court ruled at 2-ER-395-96 and 41-ER-8335. Appellants objected to the testimony of Petron (4-ER-807, 835; *see also* 41-ER-8134-36), and the district court ruled at 2-ER-400-02. Omidi objected to Oxman's statements at 30-ER-6045 and 43-ER-8626-29, and the district court ruled at 30-ER-6045 and 43-ER-8629. Appellants contested restitution and forfeiture (1-ER-25; 3-ER-557, 666, 669, 678, 692), and the district court ruled at 1-ER-16.

## ARGUMENT

## I. DISMISSAL, OR AT MINIMUM A NEW TRIAL, IS WARRANTED ON MATERIALITY GROUNDS.

### A. The Government Failed to Prove Materiality.

Each count for mail fraud, wire fraud, or false statements required the government to prove materiality. *Neder v. United States*, 527 U.S. 1, 25 (1999) (mail and wire fraud); *United States v. Alvarez*, 617 F.3d 1198, 1212 (9th Cir. 2010) (false statements in healthcare matters). "Deciding whether a statement is 'material' requires the determination of" three "questions": (1) "what statement was made"; (2) "what decision was the [decisionmaker] trying to make"; and (3) whether the "statement" had a "'natural tendency to influence, or [was] capable of influencing, the decision.'" *United States v. Gaudin*, 515 U.S. 506, 509, 512 (1995) (quoting *Kungys v. United States,* 485 U. S. 759, 770 (1988)).

20

Here, the relevant "decisions" were whether the patients' Plans covered the claims at issue. While the Materiality Witnesses discussed internal medical policies generally used by insurers to guide coverage decisions, they admitted that coverage is determined in each instance by the terms of the patient's Plan, which prevail over any contrary guideline in the insurer medical policies. *See supra* pp. 10-11. Thus, the question of whether the allegedly false statements in a claim were material turned on whether, based on the "true" facts for each patient, a different coverage decision would have been made under the terms of the patient's Plan. The terms of the applicable Plans were therefore essential to deciding materiality.

With but one possible exception (*see infra* p. 22), the government declined, for whatever reason, to offer the Plans for any patients at issue into evidence, *see* 10-ER-2059 (Reinhardt); 12-ER-2375-421 (Munson); 14-ER-2852-55 (Richer); 45-ER-9031-42 (Little); 45-ER-7964-75 (DeChellis); and each Materiality Witness acknowledged that, without seeing the Plans themselves, they could not say what coverage terms applied to any claim for any given patient. *See supra* pp. 10-11. Without the actual Plans before them, the jurors could not possibly decide whether a given "falsity" would have affected the final coverage decision for any of the claims in any of the other Counts.

21

Suppose, for example, that unbeknownst to the Materiality Witnesses, a patient's Plan followed FDA guidance[2] and covered Lap-Band surgery for comorbid patients with BMIs of 30 or above (not 35, as the insurers' medical policies generally required, 10-ER-2138). A "falsification" by Klasky that increased a patient's BMI from, say, 31 (per Michael Zarrabi) to 36 would make no difference, when measured against the actual coverage criteria.

In the one instance where the government *did* offer a patient's certificate of insurance into evidence, its terms show the claim at issue was covered regardless of the allegedly false AHI score. Health Net's Lisa LeGare identified the first part of composite Exhibit 1254 (pp. 1-180) (4-ER-909-99)[3] as the certificate of insurance for the patient J.C. whose claim is described in Count Five. 41-ER-8206-07, 8244-45, 8257, 8275-76; FSI [2-ER-514], ¶ 43, Count Five. The claim at issue was for supplies for J.C.'s CPAP machine (nasal mask, filters, and tubing). 41-ER-8248-50, 8277. J.C.'s Plan provides coverage for such "Durable Medical

---

[2] *See* FDA, Summary of Safety & Effectiveness (Feb. 16, 2011), https://www. accessdata.fda.gov/cdrh_docs/pdf/p000008s017b.pdf (last visited Nov. 20, 2023).

[3] LeGare identified pages 181-223 (4-ER-1000-42) and pages 224-79 (4-ER-1043) of Exhibit 1254 as copies of Health Net's national medical policies regarding sleep apnea and bariatric surgery, respectively. 41-ER-8206-08, 8219. The government acknowledged those documents were separate from the certificate of insurance, and that it had compiled them in a single exhibit. 41-ER-8207. Neither is referenced in the certificate of insurance itself.

22

Equipment" if prescribed by a physician as medically necessary in accordance with applicable "Medicare National Coverage Determinations (NCD)." 4-ER-944. The NCD for CPAP equipment provides it is "reasonable and necessary" for treatment of sleep apnea if the patient has either (a) AHI greater than or equal to 15, or (b) AHI between 5 and 14 together with any one of certain specified conditions, including "mood disorders."[4] According to the government, J.C.'s "true" AHI was 6.6, as listed in her Zarrabi Report, 61-ER-12716 ("DIAGNOSIS" No. 1); *see* 29-ER-5879-81, 5884-85. J.C. suffered from a mood disorder, namely, "Depression," for which she was being treated with the anti-depressant "Effexor," as documented in a physician's Initial Preoperative Evaluation, 59-ER-12156 ("PAST MEDICAL HISTORY" and "MEDICATIONS"); 41-ER-8246, 8277-79, which the government did not contend was falsified. Her CPAP machine and associated supplies were ordered in a prescription signed by Dr. Zarrabi, 41-ER-8245, 59-ER-12152, and the government did not contend that his signature was stolen for the prescription. Thus, even if the Klasky-altered sleep study submitted with her claim falsely reported her AHI as 18.5, 29-ER-5885-87, 59-ER-12153, her CPAP

---

[4] Centers for Medicare & Medicaid Servs., NCD, Pub. No. 100-3, Manual Sec. No. 240.4, "Continuous Positive Airway Pressure (CPAP) Therapy for Obstructive Sleep Apnea (OSA)" (effective Mar. 13, 2008), *available at* https://www.cms.gov/medicare-coverage-database/view/ncd.aspx?ncdid=226& ncdver=3&chapter=all&sortBy=title&bc=18 (last visited Nov. 20, 2023).

equipment was still covered under the terms of her certificate of insurance. Since the same coverage decision would follow from the "true" sleep study report, the alleged falsehood in the submitted report was not material, and therefore the government failed to prove all elements of Count Five.

Having failed to offer the actual Plans (without which there is no way to determine whether a given falsehood would naturally affect the final decision), the government's materiality evidence was insufficient to sustain the mail fraud, wire fraud, and false statements counts. In addition, because the remaining aggravated identity theft and money laundering counts are predicated on the fraud and false statement counts (*see* FSI [2-ER-514], ¶¶ 47, 53, 57), they fall together with those latter counts. Accordingly, the judgments should be reversed in their entirety.

**B. The District Court Erred in Permitting the Government to Elicit Whether the Insurers Would Have "Investigated" Further Had They Known of Some Falsity in the Claims.**

Apart from its failure to offer the Plans that actually governed coverage, the government, had another serious problem in proving materiality: The first Materiality Witness to take the stand testified point blank that claims for Lap-Band surgeries would be approved for patients with another qualifying comorbidity, such as severe hypertension, "[e]ven if there was a comorbidity," such as sleep apnea,

24

"that was falsified." 10-ER-2048-49 (Anthem representative Reinhardt).[5] Since the same coverage decision would have followed with or without the "falsified" sleep apnea diagnosis, the alleged fraud was immaterial as a matter of law.[6]

As a fallback, the government, over objection, 4-ER-807, 872-73, invited the jury, through legally improper questions, to instead find materiality based solely on the fact that, "at a minimum," the insurers would have "investigated" further had they known there was something amiss in the coverage claims. *See* 12-ER-2386, 2394; 14-ER-2895; 45-ER-9040-42, 9058-59; *see also* 10-ER-2049, 11-ER-2254.

That was plainly impermissible, as the Supreme Court's *Kungys* decision makes clear. Kungys had lied in his naturalization proceeding about his date and place of birth; the question was whether those misrepresentations were "material" for denaturalization purposes. The court of appeals—taking the same approach as the Materiality Witnesses did at trial—held that the misrepresentations were

---

[5] *See also* 12-ER-2395-96 (United Healthcare representative Munson confirming that, under a practice called "decoupling," if "there is inaccurate information in [a] claim, [United Healthcare] will decouple the claim," meaning "it will still pay [the] portion of the claim that does not contain inaccuracies").

[6] Defense expert Dr. Michael Sedrak confirmed as much during in the post-trial restitution proceedings when he found that most patients who received Lap-Band surgery would have qualified for the surgery even absent any sleep apnea diagnosis. 54-ER-10650-51, ¶¶ 13-14. Specifically, Dr. Sedrak reviewed the medical records for 789 patients who received sleep studies and found that 768 either had a BMI of over 40 or a BMI of between 30 and 40 and a qualifying co-morbidity other than sleep apnea. *Id.*

25

material because, had Kungys "told the truth at the time he applied for his citizenship," that "would have resulted in … a field investigation." *Kungys*, 485 U.S. at 774 (Scalia, J., joined by Rehnquist, C.J. and Brennan, J.).

The Supreme Court found that insufficient. Relying on the "accumulated settled meaning" of the term, *id.* at 770 (opinion of the Court), the Court held that misrepresentations are not "material" merely because the true facts, if known, would have led to an investigation. Rather, as a majority of the Court explained, Kungys's lies were material only if, as Justice Scalia put it, the actual facts were "such as gave cause to believe that the applicant was not qualified," *id*. at 774 n.9 (Scalia, J., joined by Rehnquist, C.J. and Brennan, J.), or as Justice Stevens put it, the false "statement concealed *a disqualifying fact* or hindered the discovery of *a disqualifying fact*," *id*. at 789 (Stevens, J., joined by Blackmun and Marshall, JJ., concurring in the judgment) (emphasis added).

Thus, the government had to prove in *Kungys* not only that the immigration authorities would have launched "an investigation," but also that the investigation was likely to uncover *disqualifying facts*. Because the government had failed to prove that there actually *were* such disqualifying facts, the *Kungys* Court reversed the decision below. *See id*. at 774 n.9 (Scalia, J., joined by Rehnquist, C.J. and Brennan, J.) (rejecting the idea that the materiality standard "require[s] … no more than a showing" that "the true facts would have led to further investigation"); *id*. at

26

783 (Brennan, J., concurring) (the government must "produce evidence sufficient to raise a fair inference that a … disqualifying fact actually existed"); *id*. at 789 (Stevens, J., joined by Marshall and Blackmun, JJ., concurring in the judgment) ("To prove that a misrepresentation was material, the Government must prove that the statement concealed a disqualifying fact or hindered the discovery of a disqualifying fact").

Consistent with *Kungys*, in *United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015), the Second Circuit reversed a jury conviction for fraud on the United States (18 U.S.C. § 1031)—specifically, the Treasury Department—for insufficient proof of materiality, even though the defendant's misstatements had caused Treasury to launch an investigation. *Litvak*, 808 F.3d at 172-74. The Second Circuit explained that "every prosecution for making a false statement undoubtedly involves 'decisions' by the government to refer for investigation, investigate, and prosecute the defendant for making the false statement at issue." *Id*. at 173. "These 'decisions' are necessarily 'influenced' by the false statement, but *the materiality element would be rendered meaningless if it were sufficient for the government merely to establish the capability of the false statement to influence an agency staffer's … 'decision' to refer [the matter] for investigation.*" *Id*. (emphasis added). "Therefore," the court concluded, "the fact that the Treasury decided to refer [the defendant]'s statements for investigation … [does not have] any bearing

27

on the materiality of those statements as required by the statute in the instant context." *Id*. at 173-74.

Asking the Materiality Witnesses whether, "at a minimum," the insurers would have "investigated" had they known of a falsity was therefore legally insufficient. And giving the jury that improper path to conviction cannot be disregarded as harmless. Witness after witness repeated the "investigation" mantra. *See* 12-ER-2386, 2394; 14-ER-2895; 45-ER-9040-42, 9058-59; *see also* 10-ER-2049; 11-ER-2254. And the government pounded the point home in summation, telling the jury, "Because as you heard, if someone is trying to submit [a] partially true, partially false" claim, "the false starts to … challenge the credibility of the remainder," so that "the insurance company would, at least, look at it further at that point." 49-ER-9761. That was no substitute for relevant evidence of materiality, and the error in allowing it requires a new trial.

## II. APPELLANTS ARE ENTITLED TO A NEW TRIAL BASED ON ERRONEOUS JURY INSTRUCTIONS.

### A. The "Reckless Indifference" Instruction Was Legally Erroneous.

Every charge in this case required the government to prove that Appellants acted "knowingly" and "with intent to defraud" (or with the specific intent particular to the charge). *See, e.g.*, 2-ER-362-69 (Instr. No. 25 (mail fraud), 26 (wire fraud)). Over objection (47-ER-9332-36), the district court gave Instruction Number 34, entitled "Proof of Knowledge or Intent":

28

> The intent of a person or the knowledge that a person possesses at any given time may not ordinarily be proved directly because there is no way of directly scrutinizing the workings of the human mind. Because direct proof of knowledge and fraudulent intent of what a person is thinking is almost never available, the state of mind of the defendant may be proved by circumstantial evidence. *It can also be shown if the defendants acted with reckless indifference to the truth or falsity of their statements.*

2-ER-378 (Instr. No. 34) (emphasis added). In fact, "reckless indifference as to truth or falsity" proves *neither* intent *nor* knowledge.

**a.** "Reckless indifference" as to the truth or falsity of statements certainly cannot prove intent to defraud. The very notion of "intent to defraud" connotes a *purposeful* state of mind. Merriam-Webster Dictionary, "Intent", available at https://www.merriam-webster.com/dictionary/intent (last visited Nov. 20, 2023) ("the design or purpose to commit a wrongful or criminal act"). A defendant does not act with *purpose* merely by acting recklessly. "Recklessness," the Supreme Court observed in *Borden v. United States*, is "*a less culpable mental state than purpose.*" 141 S. Ct. 1817, 1821-22 (2021) (relying upon Model Penal Code § 2.02) (emphasis added).

Ignoring this dispositive case law, the district court relied on several earlier cases that have not stood the test of time. True, there is language in cases such as *United States v. Dearing*, 504 F.3d 897 (9th Cir. 2007), and *United States v. Gay*, 967 F.2d 322 (9th Cir. 1992), that "intent to defraud may be proven through reckless indifference to the truth or falsity of statements," 1-ER-288. But at the

29

time those cases and others like it were decided, this Court had held that "intent to defraud" required only "an intent to deceive *or* cheat." *United States v. Miller*, 953 F.3d 1095, 1102 (9th Cir. 2020) (emphasis added). If "an intent to deceive" were all it took to show "intent to defraud," then, at least in theory (*but see infra pp.* 32-35), "reckless indifference" as to the truth of a representation might be enough to prove intent to defraud.

But this Court squarely rejected that disjunctive formulation—"intent to deceive *or* cheat"—in *Miller*. Expressly overruling circuit precedent and a long-standing pattern jury instruction, *Miller* held that a scheme or intent to defraud instead requires *both* "the intent to deceive *and* cheat—in other words, to deprive the victim of money or property by means of deception." *Id*. at 1103. Similarly, in vacating the convictions in *United States v. Yates*, this Court reinforced that "[i]ntent to deceive and intent to defraud are not synonymous." 16 F.4th 256, 265 (9th Cir. 2021). A scheme to defraud "must be one to deceive [the victim] *and* deprive it of something of value." *Id*.

Because "intent to defraud" requires *both* an intent to deceive *and* an intent to cheat out of "money or property," even a defendant's *actual knowledge* of falsity cannot suffice to prove "intent to defraud" under *Miller*. People lie about any number of things without thereby intending to cheat anyone out of money or property—and hence without an "intent to defraud." A spouse may lie about

30

where they were last night, and they may have lots to answer for if their deception is revealed, but that doesn't mean they had designs on "money or property." Still less can mere reckless indifference to truth or falsity suffice to prove intent to cheat someone out of money or property. Yet Instruction 34 told the jury exactly the opposite.

In light of *Miller*'s instruction that "intent to defraud" requires more than simply an intent to deceive, the line of cases that includes *Dearing* and *Gay* is unsustainable. Indeed, those cases were on legal quicksand from the start. The earliest of the cases, *Irwin v. United States*, 338 F.2d 770, 774 (9th Cir. 1964), relied solely on an even earlier Tenth Circuit case, *West v. United States*, 68 F.2d 96, 98 (10th Cir. 1933), which had asserted in a single sentence that a defendant could be found guilty of mail fraud if he knew his statements were false when made "or acted with reckless indifference as to whether they were true or false." *West* cited no authority and offered no reasoning for its statement, *see id.*

The entire line from *West* to *Irwin*, on through *Dearing* and *Gay*, and up to *United States v. Abaji*, 820 F. App'x 544, 546 (9th Cir. 2020), is born out of that unsupported, unreasoned, and mistaken proposition. Between the late 1970s and early 1980s, *West* and *Irwin*'s descendants in this Circuit metastasized from holding that reckless indifference to truth or falsity was tantamount to knowledge of falsity, *see, e.g.*, *United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir. 1976), to

31

holding that reckless indifference to truth or falsity sufficed to sustain a mail fraud conviction, *see, e.g.*, *United States v. Farris*, 614 F.2d 634, 638 (9th Cir. 1979), and finally to holding that reckless indifference to truth or falsity sufficed to show specific "intent to defraud," *see, e.g.*, *United States v. Cusino*, 694 F.2d 185, 187 (9th Cir. 1982).

But *Miller* and the Supreme Court decisions it applies require that the *West* line of cases be laid in its grave. Intent to cheat out of money or property—and hence the "intent to defraud" required to convict for mail and wire fraud—entirely differs in kind from, and therefore cannot be shown solely by, knowledge that one's statements are false, much less by mere reckless indifference as to their truth or falsity.

**b.** But Instruction 34 is worse still: "Reckless indifference" as to truth or falsity does not even prove "knowledge." Although there is, again, language in some of this Court's cases suggesting otherwise, the Supreme Court's decisions in *Global-Tech* and *Borden* and this Court's en banc decisions in *Jewell*, *Gracidas-Ulibarry*, and *Heredia* have dispositively held that reckless indifference does *not* amount to knowledge. *See No Casino in Plymouth v. Nat'l Indian Gaming Comm'n*, 2023 WL 4646113, at *1 (9th Cir. July 20, 2023) (en banc opinions take precedence over panel opinions).

32

The Supreme Court's *Borden* decision is, again, right on point:

Recklessness is "a less culpable mental state than purpose *or knowledge*."  141 S.

Ct. at 1821-22 (emphasis added); *United States v. Morton*, 2022 WL 17076203, at

*1 (9th Cir. Nov. 18, 2022) (same, quoting *Borden*); *see also United States v.*

*Gracidas-Ulibarry*, 231 F.3d 1188 (9th Cir. 2000) (en banc) (recognizing Model

Penal Code § 2.02's "hierarchy of four levels of culpable states of mind," which

include in descending order of culpability "purpose, knowledge, recklessness and

negligence").

That is precisely why this Court has held, for nearly fifty years, that

"recklessness" *cannot* be used as a definition of knowledge in a criminal case.  In

*United States v. Jewell*, 532 F.2d 697 (9th Cir. 1976) (en banc), this Court

approved a willful blindness instruction as a means of showing knowledge, but

expressly cautioned that "neither reckless disregard nor suspicion followed by

failure to make full inquiry would be enough."  *Id.* at 704 n.21.  Six years later, this

Court struck down a knowledge instruction precisely because, like Instruction 34,

"it equated reckless conduct with knowing conduct."  *United States v. Williams*,

685 F.2d 319, 321 (9th Cir. 1982).  "Although conscious avoidance of the truth

may constitute knowing conduct," the *Williams* court added, "reckless conduct

alone is not sufficient."  *Id.*  And more recently, in *United States v. Heredia*, 483

F.3d 913 (9th Cir. 2007), this Court, again sitting en banc, reaffirmed the rule in

33

*Jewell*, emphasizing that a willful blindness instruction must never devolve "to something akin to recklessness or negligence." *Id.* at 924. "Recklessness or negligence," this Court emphatically held, "never comes into play." *Id.*

Citing *Heredia* with approval, the Supreme Court in *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011), reinforced the point. The Court observed that virtually all circuits (including the Ninth) had defined willful blindness to require the government to prove that the defendant took "*deliberate actions to avoid learning*" the truth. *Id.* at 769 & n.9 (emphasis added). That "deliberate action" requirement, the Court explained, "give[s] willful blindness an appropriately limited scope that *surpasses recklessness* and negligence" and thus suffices to establish knowledge. *Id.* at 769-70 (relying upon Model Penal Code § 2.02) (emphasis added). "Under this formulation, a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Id.* at 769. "By contrast, a reckless defendant is one who merely knows of a substantial and unjustified risk of such wrongdoing." *Id.* at 770.

Finally, expressly relying on *Global-Tech* and *Heredia*, this Court upheld the Ninth Circuit model instruction on deliberate ignorance precisely because it leaves "little reason to suspect that juries will import [recklessness or negligence]

34

concepts … into their deliberations." *United States v. Yi*, 704 F.3d 800, 804-05 (9th Cir. 2013) (quoting *Heredia*, 483 F.3d at 924) (alteration in the original).

By inviting the jury to "import" recklessness "into their deliberations," *id.*— indeed, by telling the jury that reckless indifference *suffices* to prove guilty knowledge—Instruction 34 was plainly inconsistent with *Borden*, *Global-Tech*, *Heredia*, and *Jewell*. The district court ignored this Court's en banc admonition that, in defining the element of knowledge, "recklessness" must "never come[] into play." *Heredia*, 483 F.3d at 924.

**c.**      The district court compounded these errors by rejecting the defense's request that it define "recklessness" for the jury. 2-ER-485-86. As the Supreme Court explained in *Farmer v. Brennan*, the "term recklessness is not self-defining." 511 U.S. 825, 836 (1994). *Farmer* recognized that, in the civil context, "recklessness" can sometimes mean as little as "gross negligence." *Id.* at 836 n.4. To avoid that implication in the criminal law context, *Farmer* instructed that, where "recklessness" is a sufficient level of scienter, it must be defined to require proof that the defendant "'consciously disregard[ed]' a substantial risk of serious harm." *Id*. at 839 (quoting Model Penal Code § 2.02(2)(c)).

Applying *Farmer*, this Court has reversed convictions, even on plain error review, where the trial court failed to instruct the jury that, to be criminally reckless, "the defendant 'must both *be aware of facts* from which the inference

35

could be drawn that a substantial risk of serious harm exist, and he must *also draw the inference*.'" *United States v. Rodriguez*, 880 F.3d 1151, 1159-60 (9th Cir. 2018) (quoting *Farmer*, 511 U.S. at 837); *accord United States v. Tydingco*, 909 F.3d 297, 304, 306 (9th Cir. 2018) (because instruction failed to define "reckless disregard" in accordance with *Rodriguez*, "the jury might have relied on a legally invalid theory," and such "possible reliance" warranted reversal on plain error review).[7]

    **d.**    To sustain Omidi's convictions in this case, the government must therefore show that Instruction 34 was harmless beyond a reasonable doubt. *Romo-Romo*, 246 F.3d at 1274. It cannot possibly do so.

    First and foremost, the evidence that Omidi *actually knew* of the misrepresentations to the insurers was heavily contested. As noted *supra* pp. 5-6, 13-15, Klasky, and to a much lesser extent Hong, were the only witnesses who claimed that Omidi directed them to submit false claims. Both of them were

---

[7] The district court relied on *United States v. Lloyd*, 807 F.3d 1128 (9th Cir. 2015), which declined to define "recklessness" (1-ER-290), but *Farmer* controls. Moreover, the instruction upheld in *Lloyd* provided that a statement is fraudulent if the defendant both knew it was false, or was recklessly indifferent to its truth or falsity, *and made it with the intent to deceive*. *See Lloyd*, 807 F.3d at 1163. Thus, even under *Lloyd*, Instruction 34 fell short by allowing proof of *both* knowledge and intent by reckless indifference alone.

subjected to withering cross-examination, and the jury could easily have rejected their testimony as incredible.

And that's where Instruction 34 did the most damage. After correctly stating the elements of willful blindness in Instruction 33, the district court diluted those elements in the very next instruction, telling the jury that "reckless indifference" sufficed to prove both knowledge and intent to defraud, and leaving it to the jury's imagination what the undefined term "reckless indifference" meant.

The government then made the most of those errors. It urged the jury to infer reckless indifference from the fact that allegedly suspicious materials had crossed Omidi's desk, and yet he failed to blow the whistle. The government contended, for example, that because Omidi supposedly engaged in the "Herculean task" of reviewing "almost every [patient] chart" (49-ER-9738), he should have "see[n] the patterns" of someone else's—Klasky's—fraud (49-ER-9739, 50-ER-10019-20,). *See also* 22-ER-4728, 4737 (Hong testifying that Omidi should have known the nutritional evaluations were fraudulent because "he's the one reviewing all the charts"); 23-ER-4794-95, 4826; 24-ER-4926 (sleep studies). The prosecutors also offered evidence of "hectic and chaotic" business practices (38-ER-7635) suggestive of gross negligence, which the jury could have mistakenly believed constituted recklessness since the district court never defined the term. The government even called an expert witness about the "standard of care" for

37

sleep testing, thereby encouraging a verdict based on simple malpractice. 15-ER-3125, 3141-46, 3149-67.

Then, in summation, the government invited the jury to convict on a finding that Omidi merely should have known a game was afoot. "[E]ven if the defendants acted with reckless indifference as to whether the claims and statement they submitted were true or false, as the Court instructed you, they still intended to defraud." 49-ER-9737. The government reiterated the point in rebuttal, noting that Omidi was reviewing sleep study reports, which must have caused him to have "suspicions." 50-ER-10029.

Because Instruction 34 impermissibly diluted the legal standards for both knowledge and intent, Appellants are entitled to a new trial on all counts.

### B. The "Willful Blindness" and "Reckless Indifference" Instructions Constructively Amended the Indictment.

"A person is entitled under the Fifth Amendment not to be held to answer for a felony except on the basis of facts which satisfied a grand jury that he should be charged." *United States v. Tsinhnahijinnie*, 112 F.3d 988, 992 (9th Cir. 1997). A jury instruction constructively amends an indictment and violates the Fifth Amendment "when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them." *United States v. Davis*, 854 F.3d 601, 603 (9th Cir. 2017). The same holds

38

true when a conviction is permitted on a "complex of facts" that is "distinctly different from those set forth in the charging instrument." *Id.*

The indictment in this case alleged a "complex of facts" alleging, with respect to every count, that Omidi acted with *actual knowledge and personally directed the fraud*. The indictment asserted, for example, that Omidi had "instructed" Klasky to falsify sleep study reports to make it appear that patients had OSA when they in fact did not, or to make it appear that they had more severe OSA than they actually did (FSI [2-ER-528], ¶ 38(h)); that Omidi "authorized" other employees to assist Klasky in the falsification of sleep study reports ("SSRs") (*id.*); that Omidi "instructed" Klasky to provide Epworth ("ESS") scores for patients, which Omidi "knew" were fabricated to indicate falsely that the patients were suffering from extreme daytime sleepiness when in fact they were not (*id.* ¶ 38(i)); that Omidi "instructed" Klasky to falsify the SSRs, "knowing and intending" that they would be provided to insurers to request pre-authorization for Lap-Band surgery (*id.* ¶ 38(j)); that Klasky and others, acting at Omidi's "direction," falsified patient heights, weights, and BMIs, and Omidi "knew and intended" that this false information would be used to obtain insurers' pre-approval for Lap-Band surgery (*id.* ¶ 38(k)); Omidi "directed" employees to revise letters of medical necessity to reflect falsified SSRs and ESS scores, "knowing" that they were false (*id.* ¶ 38 (l)); that SSRs were fraudulently altered by Klasky, Hong, and

39

others at Omidi's "direction" (*id.* ¶ 38(m)); that Omidi "knew and intended" that falsified SSRs would be submitted to insurers in support of sleep study claims (*id.* ¶ 38(n)); that Omidi "knew and intended" that falsified SSRs sent to durable medical equipment providers would be used by those providers in support of insurance claims (*id.* ¶ 38(q)); and that Omidi "directed" Klasky to destroy and conceal evidence of the falsification (*id.* ¶¶ 38(r) & (s)). There was not so much as a whisper, anywhere in the FSI, that Omidi was willfully blind, much less that he acted with reckless indifference to the truth.

Instructions 33 and 34 (2-ER-377-78), however, authorized the jury (over defense objections, 47-ER-9326-36) to convict on a "distinctly different" "complex of facts," *Davis*, 854 F.3d at 603—either "deliberate ignorance" (Instruction 33), meaning that Omidi deliberately avoided learning of *someone else's fraud*, or even as little as "reckless indifference to the truth" (Instruction 34), meaning that Omidi was subjectively aware of a substantial risk that Klasky and Hong were making false statements to insurers but failed to stop them. That is a classic constructive amendment. As this Court has admonished,

> when conduct necessary to satisfy an element of the offense is charged in the indictment and the government's proof at trial includes uncharged conduct that would satisfy the same element, we need some way of assuring that the jury convicted the defendant based solely on the conduct actually charged in the indictment.

*United States v. Ward*, 747 F.3d 1184, 1191 (9th Cir. 2014).

> Typically, that assurance will be provided by jury instructions requiring the jury to find the conduct charged in the indictment before it may convict. If the jury instructions do not impose that limitation, however, the defendant's conviction could be based on conduct *not* charged in the indictment. That possibility results in a constructive amendment of the indictment, requiring reversal, because it "destroy[s] the defendant's substantial right to be tried only on charges presented in an indictment."

*Id.* (quoting *Stirone v. United States*, 361 U.S. 212, 217 (1960)).

In this case, the indictment, with ubiquitous allegations that Omidi personally directed every single step in the scheme, charged Omidi with actual knowledge—full stop. Apparently concerned (and with good reason) that the jury might reject that theory, the government served up two un-charged alternatives: deliberate ignorance or, still worse, reckless indifference. "Actual knowledge, of course, is inconsistent with willful blindness." *Heredia*, 483 F.3d at 922. And "recklessness" is "categorically different" from either. *Id*. at 918 n.4.

This Court has repeatedly reversed convictions where, as here, instructions authorized the jury to convict on facts departing from those found by the grand jury. *See, e.g.*, *Davis*, 854 F.3d at 605; *Ward*, 747 F.3d at 1192; *United States v. Choy*, 309 F.3d 602, 607 (9th Cir. 2002); *United States v. Dipentino*, 242 F.3d 1090, 1096 (9th Cir. 2001).

In the district court's view, however, there was no constructive amendment because Instructions 33 and 34 merely "provided a means of proving Defendant Omidi's knowledge and intent." 1-ER-288. That simply restates the problem: If,

41

as here, an instruction "provides a means of proving" an element that differs from the "means" found by the grand jury, it enables conviction on different facts or conduct than was charged in the indictment. Thus, even when the statute under which the defendant was charged expressly provides multiple alternative means of proving the element of scienter, an instruction must adhere to the particular means charged in the indictment. *See*, *e.g.*, *Davis*, 854 F.3d at 605 (finding constructive amendment where indictment for sex trafficking a minor under 18 U.S.C. § 1591(a) alleged that the defendant either knew or recklessly disregarded that the victim was underage, but jury instruction afforded a third option for convicting provided in the statute, namely, that the defendant "*had a reasonable opportunity to observe*" the victim).

Indeed, even on plain error review, this Court has held that the government is limited to proving the specific means or theory described in the indictment's statement of facts. *See United States v. Shipsey*, 190 F. 3d 1081, 1087 (9th Cir. 1999). In *Shipsey*, a prosecution under 18 U.S.C. § 664, this Court held that the government was "obligated to prove" the only theory stated in the indictment's "statement of facts and circumstances," which was expressly incorporated into the charging theft counts: theft by means of fraudulent pretenses. *Id*. Holding that the indictment's incorporation of its statement of facts into the charging paragraphs defined the government's theory, and that a departure therefrom constitutes a

42

constructive amendment, this Court rejected the government's contention "that the district court was not required to limit its instructions to a single theory" because the indictment's broadly-worded theft counts did not "specify[] any single means of doing so." *Id*. By omitting the narrowing language incorporated from the statement of facts, the instructions constructively amended the indictment. *Id*.

The same error occurred here. As in *Shipsey*, the indictment expressly incorporated its statement of facts into every charged count of the indictment. *See* FSI [2-ER-514], at 1 & ¶¶ 38, 44, 46, 48, 50, 56. And that statement of facts alleged that Omidi "instructed," "directed," or "authorized" every act of falsifying and fabricating records carried out by Klasky, Hong, and others, knowing and intending that the falsified records would be submitted to insurers. But the district court relied *only* on the broad statutory language of the charging counts in holding the government was permitted to prove that Omidi acted "knowingly" by various other means or theories, such as deliberate ignorance or reckless indifference. *See* 1-ER-288 (citing FSI [2-ER-514], ¶¶ 37, 43, 47, 49, 53, 57). Critically, the district court overlooked the "statement of facts" in the FSI, an essential and delimiting part of the charges themselves, *Shipsey*, 190 F.3d at 1087, which set forth only one theory of knowledge, namely, that Omidi was the all-knowing mastermind who personally directed every step in the entire fraudulent scheme, *see* FSI [2-ER-514],

43

¶¶ 38(a)-(t).  And, under *Shipsey*, that is the theory the government was "obligated to prove," 190 F.3d at 1087.[8]

   "Because there is a real likelihood that the jury actually convicted [Omidi] of a crime for which the grand jury did not indict him, the district court's instruction[s] constructively amended the indictment."  *Shipsey*, 190 F. 3d at 1087. Indeed, even a "possibility" that "the defendant's conviction could be based on conduct *not* charged in the indictment" "results in a constructive amendment of the indictment."  *Ward*, 747 F.3d at 1191.  And "a constructive amendment always requires reversal," *Adamson*, 291 F.3d at 615, especially in a case like this one, where scienter was vigorously contested, and the government aggressively capitalized on these alternative theories of scienter.  *See* 49-ER-9737 (government summation).

---

[8] The district court waved *Shipsey* aside with a "*cf.*" cite and relied instead on *United States v. Love*, 535 F.2d 1152 (9th Cir. 1976), and *Lloyd* to conclude that "[t]he Ninth Circuit has rejected similar arguments that inclusion of a deliberate ignorance or reckless indifference jury instruction causes a constructive amendment or variance."  1-ER-789.  But neither case controls.  *Love* long pre-dated *Shipsey* and its teaching that allegations incorporated from an indictment's statement of facts limit the theories upon which the government may prove its case.  In *Lloyd*, the statement of facts did *not* specify any particular theory of mens rea for its mail and wire fraud charges, *see* Indictment, *United States v. Toll, et al.*, No. 2-11-cr-543-JFW, Dkt. 1 (C.D. Cal. June 15, 2011), so the government was not limited in what theory it could present to the jury.

Finally, even if this case were characterized as a variance and not an amendment, Omidi's conviction would still have to be reversed because the variance "affected [his] substantial rights," namely, his right to be "inform[ed] … 'what he is accused of doing in violation of the criminal law, so that he can prepare his defense.'" *Adamson*, 291 F.3d at 616. The district court's only stated rationale for including the willful blindness instruction over Omidi's objection was that Klasky had testified at trial that he tried to show Omidi the spreadsheet he used to alter the SSRs but Omidi didn't want to see it. 47-ER-9327. That rationale, however, only further highlights that the government presented a fundamentally different set of facts at trial than it presented to the grand jury. In the grand jury, unlike at trial, Klasky claimed that Omidi *did* review the spreadsheet as Klasky showed it to him.[9] That doubtless helps to explain why the grand jury found *only* a

---

[9] Specifically, Klasky testified to the grand jury:

> [Omidi] said, "You need to make those reports different." And so I said, "Okay. Let me think about it. Let me work on it." And then I did. And then I showed him the results of my work. And I said, "See, it works like this. See, it works like that." *And so he would look at -- he was looking at the Excel file. And he saw that the numbers would change, you know, when you put in severe, when you put in mild, when you put in moderate.* And then I showed him which part of the sleep study it would affect.

52-ER-10441 (emphasis added). *Compare* 29-ER-5850 (Klasky trial testimony that Omidi refused to look at his spreadsheet).

45

theory of actual knowledge, not the lesser substitutes that Instructions 33 and 34 authorized the jury to apply.

This Court found a fatal variance in *Adamson* under circumstances that were far less stark. There, a wire fraud defendant's substantial rights were prejudiced because he based his defense on the sole misrepresentation identified in the indictment, but the government's proof at trial centered on a different misrepresentation. *See* 291 F.3d at 616; *see also Jeffers v. United States*, 392 F.2d 749, 752-53 (9th Cir. 1968) (finding variance fatal when defendant was potentially convicted based on fact not found in the indictment). Similarly here, based on the indictment's allegations identifying him as the puppet master directing Klasky's fraud, Omidi's defense was that he did not know of, much less direct, Klasky's falsification of records and that Klasky had motives to do so on his own. A variance on such crucial elements went to the heart of Omidi's defense and was unquestionably prejudicial.

## III. APPELLANTS ARE ENTITLED TO A NEW TRIAL BASED ON ERRONEOUS EVIDENTIARY RULINGS.

### A. The Zarrabi Reports Were Not Admissible Under FRE 803(6).

The central charge in this case was that Charles Klasky, ostensibly at Omidi's direction, "falsified" the AHI numbers. FSI [2-ER-514], ¶¶ 38(g)-(h). Having unaccountably failed to preserve any finalized reports from Dr. Zarrabi, *see supra* p. 6, the government chose to treat Michael Zarrabi's *draft* reports (the

46

"Zarrabi Reports") as if they were indistinguishable from his brother's final reports. 22-ER-4557; 46-ER-9122-23. To prove that Klasky had, in fact, "falsified" the AHI results, the government therefore juxtaposed the "true" AHI numbers reported by Michael Zarrabi and the generally higher numbers prepared by Klasky. *See, e.g.*, 59-ER-12218, 12464; 21-ER-4522-26; 22-ER-4556-57; 36-ER-7182-85, 7197-98; 39-ER-7841-43. That difference, said the government, was the measure of fraud in this case. Armed with the Zarrabi Reports, the government then called witness after witness to show both the extent of the putative fraud, and the actual and intended losses allegedly sustained by the insurers.

It is undisputed that the government offered, and the district court admitted, the Zarrabi Reports "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Indeed, the government acknowledged as much point blank. 41-ER-8152; *see also* 22-ER-4557 (referring to the Zarrabi Reports as showing the patient's "actual diagnosis"); 46-ER-9122-23 (government referring to the Zarrabi Reports as setting "the baseline"); 39-ER-8741-43. And by admitting the reports under Rule 803(6), the district court necessarily admitted the reports for their truth. *See* Fed. R. Evid. 801(c).

That was a wholesale abuse of discretion. Rule 803(6) required the government to establish that "(A) the record was made at or near the time by … someone with knowledge; (B) the record was kept in the course of a regularly

47

conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions [we]re shown by the testimony of the custodian or another qualified witness …; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."  Fed. R. Evid. 803(6); *see In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385 (9th Cir. 2010) (party seeking admission of evidence has "the burden of proof to show its admissibility").  The government fell woefully short of meeting its burden.

    **a.**    The evidence stumbled at the very first hurdle:  Rule 803(6) records must be made by "someone with knowledge."  Does a witness who believes the CIA is on his trail, sees tiny cameras in every corner, suffers from psychotic delusions (4-ER-895), had attempted suicide (18-ER-3661-62), concedes that he often used only his "imagination" to create the reports (4-ER-889), and who is uniformly regarded as incompetent by his peers (*see infra* pp. 53-54), nevertheless have the requisite "knowledge" under Rule 803(6)?  The government certainly thought so.  According to the government, it did not matter whether Michael Zarrabi was a "good or mediocre scorer," so long as "he was the only one there to score this and do this."  41-ER-8320-21.  The district court evidently agreed, asking defense counsel, "What does it matter whether those scores are out of the

48

top of his head or … are actual and correct?" (41-ER-8319), and ultimately concluding, "what matters is that there was a report generated" (41-ER-8322).

That makes no sense. While Michael Zarrabi's complex conditions—disabilities that plagued him during his time at SCM (4-ER-895)—surely engage one's sympathies, it is hard to square them with the concept of "knowledge." "Knowledge" connotes, at a minimum, the ability to take in information, process it rationally, then record it as faithfully as reason permits. Michael Zarrabi, tragically, had none of these capacities at the time he created his reports. *See id.*

**b.** Which brings us to the second hurdle: Because the government elected not to call Michael Zarrabi, the custodian of the Reports, it was therefore required to produce one or more "qualified witnesses" to lay the 803(6) foundation. The government argued (14-ER-2844; 41-ER-8301-03), and the district court apparently agreed (14-ER-2845; 41-ER-8306, 8322, 8329), that Charles Klasky and Sherwin Hong fit the bill.

Klasky certainly didn't. He never actually observed Michael Zarrabi doing his work or creating the reports. 31-ER-6291. Klasky was unsure of what program Michael Zarrabi used to gather the raw sleep data and input it into his computer for scoring, 29-ER-5757, and could not say how often Michael Zarrabi relied on "auto-scoring" or scored them manually, 29-ER-5779.

49

And it is scarcely surprising that Klasky was unable to pinch hit for Michael Zarrabi. Michael Zarrabi worked from home and stored the reports on a personal (not business) hard drive. 28-ER-5640-41; 31-ER-6291-92. Klasky was in no position to observe how Michael Zarrabi prepared his reports, how he stored them, or even whether he simply picked numbers out of a hat. "I didn't see him actually do it," Klasky acknowledged. 28-ER-5640-41; *accord* 35-ER-7051 ("I didn't see him doing it in person."). Nor did Michael Zarrabi ever call Klasky to discuss the data he was seeing or the recording he was doing. 28-ER-5618-19.

For his part, Sherwin Hong was, if anything, even less "qualified" to substitute for Michael Zarrabi as "custodian." Indeed, Hong flatly conceded that he had no personal knowledge of how the Zarrabi Reports were created or whether they were accurate. 25-ER-5240-41. "I am not in the room," said Hong.[10] 25-ER-5240. Although Michael Zarrabi sometimes told Hong what he was scoring, Hong didn't know "really the picture" or "how it works." 23-ER-4808. And he readily agreed that he simply moved Michael Zarrabi's reports "from one location to another." 25-ER-5240-41.

---

[10] *Cf.* Lin-Manuel Miranda, "The Room Where It Happens," *Hamilton: An American Musical* (2015) ("No one really knows how the game is played / The art of the trade / How the sausage gets made / We just assume that it happens / But no one else is in the room where it happens").

50

**c.**      Then comes the next hurdle:  Both "the source of information" and "circumstances of preparation" show that the Zarrabi Reports "indicate a lack of trustworthiness."  Fed. R. Evid. 803(6).

Start with "the source" of Michael Zarrabi's "information."  Michael Zarrabi derived his reports from raw data generated by sleep study technicians.  FSI [2-ER-514], ¶¶ 38(g)-(h); 29-ER-5755-58.  Even if Michael Zarrabi were the most skilled RPSGT in the world, and in full possession of his mental faculties, his reports were only as good as the raw data he inherited.  And as the saying goes, "garbage in, garbage out."  As Klasky testified, some of the sleep technicians "should never [have] be[en] at a sleep center by themselves" (28-ER-5603), and "didn't know how to do their jobs" (31-ER-6257-58; *see also* 31-ER-6259-68).  In Klasky's view, the sleep technicians were generally "not good at hooking people up," and failed to respond appropriately when patients "yank things off" and "lose that connection."  28-ER-5608.  "[Y]ou have to make sure that you have people who are watching that data, because here, clearly, we had 114 reports where there was no data, no data at all."  *Id.*  Klasky also confirmed that "sometimes there would be no data half way through the sleep study."  31-ER-6260.  In some instances, "there were only receptionists and processing people" available to conduct the studies.  36-ER-7147.  As Klasky noted, "[t]hose are the quality – in quotes – of the people that were charged with watching the patients overnight and hooking them up

51

correctly." *Id*. As Michael Zarrabi himself self-reported in an email to Klasky: "if insurance companies ask for report and raw data, There would be areas that we can NOT justify the quality of work. Please keep it in mind." 4-ER-880.

As Dr. Daniel Norman, an expert called by the government as a check on Michael Zarrabi's work,[11] explained, raw data "is the basis by which all of the scoring and the interpretation flows." 15-ER-3159. Dr. Neil Kline, a sleep specialist who worked for SCM in June 2010, testified that the raw data here were "very poor," "frustrating to look at," and "lacked credibility." 9-ER-1823. Dr. Kline attributed the poor data to "equipment [that] was faulty" or "probes [that] had fallen off" the patient during the night. *Id*. As Dr. Kline put the matter to Klasky when they were both working for SCM, "The night techs need a lot of work. The data is pretty sloppy. Several studies have several channels out for most of the night. This suggests laziness or incompetence or tech is asleep." 59-ER-12132. The lack of accurate data, in short, made the sleep studies "impossible to score." 9-ER-1826, 1845-46; *see also* 9-ER-1884. Even the government was constrained to acknowledge that the technicians were incompetent. 49-ER-9725.

---

[11] One of the case agents acknowledged that she and the prosecutors had "brainstormed" about what they could do "to demonstrate that the GT_MZ reports were accurate." 46-ER-9162. The exercise did not bear fruit. *See infra* p. 55.

As for "the circumstances of preparation" of the Zarrabi Reports, they were scandalously untrustworthy. Michael Zarrabi was, by universal acknowledgment, utterly incompetent. Michael Zarrabi himself admitted there were times where he "just used [his] imagination" to produce the reports. 4-ER-889. And in the instances where Michael Zarrabi did not fabricate the reports outright, the output was still thoroughly unreliable. He prepared reports that listed patients as having stopped breathing for over five minutes (45-ER-8966-67), over seven minutes (42-ER-8489-91), and over eight (42-ER-8494-95). In all, the defense pointed to some 180 instances in which Michael Zarrabi recorded gaps between breathing that only Aquaman could accomplish. *See* 62-ER-13036; *see, e.g.*, 62-ER-13087 (purporting to record apneas for one patient with a "Max[imum ]Dur[ation]" of 5,126.5 seconds—i.e., *85 minutes*!). And he recorded BMI figures too high for any actual human. 46-ER-9156 (government case agent confirming Michael Zarrabi recorded BMIs of 7,339 and 7,733 and that it "is impossible to have that score").[12]

Even Klasky, the government's chief witness, distrusted Michael Zarrabi's work. 31-ER-6283. He thought an additional RPSGT should have been hired. 28-ER-5605-06. He also complained that, because the sleep technicians were "failing

---

[12] A 6-foot-tall human would need to weigh *over 54,119 pounds* to have a BMI that high. *See* https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm.

to properly hook up the patient," Michael Zarrabi's AHI numbers were lower than they should have been. 32-ER-6412-13. In time, Klasky recommended that Michael Zarrabi be ousted from his position because "he didn't know what he was doing," a conclusion that, according to Klasky, was "confirmed by Dr. Neil Kline." 34-ER-6760.

Indeed so. Dr. Kline had served for a period of time as one of Michael Zarrabi's colleagues, but unlike Michael Zarrabi was actually qualified to score sleep studies. During his time working with Michael Zarrabi, Dr. Kline recognized that data was often "missing" and "corrupt." 59-ER-12114; *see* 9-ER-1915-16. Indeed, in one instance, Dr. Kline could interpret only 17 out of 195 studies he'd been asked to interpret (59-ER-12114), and he told the government that data was so insufficient that "he wasn't able to score" studies Michael Zarrabi purported to score (46-ER-9163-64). And when Dr. Kline received data that *could* be interpreted, he quickly found that Michael Zarrabi was over his head. "He missed some pretty obvious apneas," and as a result his AHI figures were often too low. 9-ER-1831-32; 59-ER-12125. Dr. Kline also determined that Michael Zarrabi had missed a number of hypopnea events, and had therefore "underdiagnosed sleep apnea, potentially." 9-ER-1917; *see also* 9-ER-1925-26 (Kline finding that Michael Zarrabi had "cut in half" a patient's actual AHI).

54

Determined to admit the Zarrabi Reports for their truth, the government called Dr. Norman to attempt to rescore the Zarrabi Reports with the aim of confirming Michael Zarrabi's accuracy. But Dr. Norman likewise provided cold comfort. As he explained, "there were data elements in those files that were corrupted or missing and not available on the hard drive, which made it impossible to open many of those files." 15-ER-3210; *see also* 17-ER-3553-57. Of the total Zarrabi files on the hard drive, only 56 had readable data, and Dr. Norman reviewed and scored records for at most 24 patients, 15-ER-3210-12, a far cry from validating the AHI scores in the hundreds of Zarrabi Reports the government was allowed to introduce at trial.

    **d.**    In short, the district court's decision admitting the Zarrabi Reports for their truth was a wholesale abuse of discretion. Indeed, the court appears not to have appreciated that business records must actually *be true* to be admitted for their truth. The court several times suggested that the records might be admissible as business records under Rule 803(6) even if they were *false*—simply to show that they differed from the final versions. 41-ER-8325-26, 42-ER-8513. According to the district court, "whether the original Michael Zarrabi scores were accurately

done or not is really immaterial." 41-ER-8132. That quite obviously misapprehends what it means to admit business records *for their truth*.[13]

The district court also misunderstood what is required for business records to be betray a "lack of trustworthiness." Fed. R. Evid. 803(6). According to the district court, "trustworthy means that it's a regularly created type of document used by this business in conducting its business. Whether that information on that document is always true and correct is not the issue." 41-ER-8323-24. That cannot be right. The district court's legal ruling renders subsection (E) of Rule 803(6) superfluous, in violation of the cardinal interpretive rule that "[w]e do not lightly assume Congress adopts two separate clauses in the same law to perform the same work." *United States v. Taylor*, 142 S. Ct. 2015, 2024 (2022). The Zarrabi Reports had no business coming into evidence.

---

[13] On that obviously mistaken premise, the district court curtailed the defense's Rule 806 impeachment of Michael Zarrabi as a hearsay declarant. In the court's (mistaken) view, "[w]hether Michael Zarrabi made it up or didn't make it up or it's correct or it's inaccurate, the reality is that it's different from another subsequent report. So why does it matter whether that original report was accurate…. They may have been accurate sometimes; they may not have been accurate sometimes." 42-ER-8507-08; *see also* 42-ER-8513. Although the government broke in to advise the court that it really *was* offering the reports for their truth (42-ER-8509), the court, believing as it did that the truth of the Zarrabi Reports was unimportant, sharply limited the defense's Rule 806 impeachment on Michael Zarrabi's mental health at the time he prepared the records. 43-ER-8530.

e. The prejudice to Appellants was catastrophic. The Zarrabi Reports were, by any measure, the single most devastating pieces of proof in the case. The sheer numbers alone are telling: The district court admitted more than 70 Zarrabi Reports into evidence, together with summary exhibits comparing the purportedly "true" AHI numbers from more than 340 Zarrabi Reports to Klasky's supposedly "falsified" versions. 59-ER-12218 through 62-ER-13092. The debate over their admissibility consumed more than 250 pages in briefing, *see, e.g.*, 3-ER-761; 4-ER-810, and more than 150 pages of trial record, *see* 11-ER-2173-89, 2232-34; 14-ER-2827-45; 15-ER-3223; 16-ER-3362; 18-ER-3647-65; 21-ER-4536-39; 23-ER-4883-89; 24-ER-4930-31; 41-ER-8131-52, 8296-337; 42-ER-8501-16; 43-ER-8522-38.

But quantity alone barely scratches the surface. To prove that Klasky's sleep study claims were fraudulent, the government contended that any alteration of the Zarrabi Reports was false. *See* 47-ER-9286 (the government stating, "we do intend to argue that Michael Zarrabi's scores in there were what the patients' conditions were"). If the Zarrabi Reports had been excluded (as they should have been), there would have been no basis for the jury to conclude that Klasky's re-scorings were false. And there would have been no factual basis for the highly prejudicial "intended and actual loss" testimony of Michael Petron, which we turn to next.

57

**B.    The District Court Erroneously Admitted Petron's "Loss" Testimony.**

At trial, the government offered the testimony of Michael Petron, a forensic accountant, to estimate the intended and actual loss due to the alleged fraudulent scheme.  46-ER-9200.  Petron selected a sample of 250 patients from a population of over 8,000.  46-ER-9201-04.  The government instructed Petron to count as an "altered sleep study" any submitted sleep study whose AHI differed from the "baseline" Zarrabi Reports by at least one point.  46-ER-9169, 9209-10; 59-ER-12218.  Based on this government-provided assumption, Petron calculated the amounts billed and ultimately paid by the insurance companies for the 250 patients and extrapolated those numbers to the whole population to present the jury with these dizzying loss figures (46-ER-9213-14, 9217-19):

| Claim Type | Intended Loss | Actual Loss |
|---|---|---|
| Lap-Band Surgeries | $175 million | $41 million |
| Sleep Studies | $160.9 million | $24.3 million |
| CPAP | $17.5 million | $6 million |
| **Total** | **$353.4 million** | **$71.3 million** |

For multiple reasons, this testimony should never have been admitted.

*First*, Petron's entire analysis is premised on the assumption that the Zarrabi Reports provided the *true* AHI scores.  46-ER-9169, 9206-07; 59-ER-12345.  For the reasons discussed above, the government failed to satisfy the business records

58

exception with respect to the Zarrabi Reports, and they should not have been introduced for their truth. *See supra* pp. 46-57. Without the Zarrabi Reports as a baseline, Petron's analysis crumbles.

*Second*, at least two of the assumptions the government directed Petron to make were wildly misleading. For one thing, the government told Petron to assume that any AHI score altered by even one point caused "actual" and "intended losses." That assumption is utterly wrong.

Take Lap-Band surgeries, for example. Petron counted as a "loss" any Lap-Band surgery claim that was billed or paid where the submitted AHI was at least one point higher than the Zarrabi AHI. 46-ER-9217. But a one-point change to AHI does not necessarily mean that an insurance company suffered loss. *See* 18-ER-3723 (Dr. Norman testifying that no "reasonable sleep physician" would consider a one-point difference in AHI to be "a valid metric for measuring a clinically significant difference"). In fact, many of the AHI alterations would not have changed the insurance companies' decisions to pay a Lap-Band surgery claim. *See* 4-ER-858-59. Indeed, Petron identified only 47 patients in his sample as having actually received Lap-Band surgery. *See* 46-ER-9216-17; 60-ER-12464. But out of those 47 patients, 26 had a BMI over 40, and therefore qualified for coverage independent of any sleep apnea diagnosis. *Compare* 60-ER-12464, *with* 59-ER-12118 at Columns R, W, & Z. Another 17 of them had a BMI between 35

59

and 40, *compare* 60-ER-12464, *with* 59-ER-12118 at Columns R, W, & Z, and therefore would be covered for Lap-Band surgery if they had a qualifying co-morbidity (which Petron was not asked to and did not consider). Thus, up to 43 of the 47 Lap-Band "losses" Petron identified in his sample were not losses at all because the surgeries would have been covered absent any fraud.

The government also told Petron to assume fraud (and calculate loss) for any sleep study report for which the government was unable to locate an email from Dr. Zarrabi providing feedback on a Zarrabi Report—regardless of whether there was any alteration of Michael Zarrabi's AHI score in the report. 46-ER-9213, 60-ER-12464. The government's rationale was that if there was no feedback email from Dr. Zarrabi, then Dr. Zarrabi did not review or approve the report (and the report was therefore fraudulent). But the fact that the government did not find an email is not evidence that it didn't exist; it simply marks a failure of proof by the government. And of course, there were ways that Dr. Zarrabi could have given feedback or approval besides sending an email, such as by talking to his brother or by posting his completed report or any corrections to the FTP site (which the government failed to preserve). 4-ER-908, 35-ER-6984, 46-ER-9181-82. Yet Petron counted any amounts billed or paid where the government failed to find a feedback email from Dr. Zarrabi as a "loss" and then compounded that error by "extrapolating" it to the whole patient population.

60

Tellingly, although the district court allowed Petron to tell the jury that as a statistical matter it could have "95 percent confidence" that his resulting "loss" figures were accurate, 46-ER-9214-15, the district court ultimately rejected them in its own fact-finder capacity. For example, the court found upon sentencing that the intended "loss" on Lap-Band surgeries was *not* $175 million (as it had allowed Petron to opine to the jury), but $4.2 million, *see* 1-ER-157, and found after the restitution hearing that the actual "loss" on Lap-Band surgeries was *not* $41 million (as it had allowed Petron to opine to the jury), but *$0*, *see* 1-ER-18; *infra* p. 74. Evidence that is too unreliable to affect a sentence or justify restitution should not be good enough to convict a defendant of dozens of felonies.[14]

*Finally*, and most fundamentally, even if the assumptions underlying Petron's loss analysis were sound (they were, in fact, woefully *un*sound), the testimony was utterly irrelevant. The district court admitted Petron's loss testimony on the premise that it was probative of defendants' "knowledge and intent." 2-ER-402. That might be true in, for example, a conscious avoidance

---

[14] Obviously, the time for the trial court to perform its "gatekeeping role" under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993), was before the horse had left barn. As this Court has warned, "expert testimony carries special dangers to the fact-finding process because it 'can be both powerful and quite misleading,'" *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995) (quoting *Daubert*, 509 U.S. at 595)), and it certainly was here.

61

case; the larger the losses, the likelier it may be that a defendant was "aware" of a high risk of fraud and deliberately avoided confirming his suspicions. But the amount of loss is not relevant to a charge that the defendant *personally directed the scheme*. If a defendant is charged with directing others to rob a bank, then whether his confederates took a hundred dollars from the bank or a hundred million does absolutely nothing to prove that the defendant gave the direction. So too here. The indictment charged *only* that Omidi had actual knowledge of the scheme to defraud—because he "directed," "instructed," and "authorized" Klasky and others to commit the crime. Omidi either gave the orders or he didn't, and the amount of loss has no more bearing on that question than "a really well-made button-hole." Oscar Wilde, *Phrases and Philosophies for the Use of the Young* 6 (1903).

"Where the evidence is of very slight (if any) probative value" like Petron's simplistic extrapolation from faulty, government-supplied assumptions, "it's an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury." *United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992). Here, the prejudice from Petron's astronomical "loss" figures was more than modest; it was huge and bled into every count in the case.

### C. The Oxman Statements Were Erroneously Admitted on the False Premise that Oxman Was Omidi's Agent.

The district court admitted against Omidi a series of highly inflammatory statements allegedly made by Brian Oxman, a third party. As detailed above (*see*

*supra* pp. 8-9), these included a possible death threat to the government's principal witness, an attempt to suborn the perjury of a second witness, and a threat of litigation against yet a third witness. The government capitalized on those crucial rulings both in closing argument (49-ER-9746-48), and with even greater gusto in rebuttal (50-ER-10015-17).

The Oxman statements should never have come into evidence. They were irrelevant because, without a sufficient basis for attributing the statements to *Omidi himself*, a threat by some third person has no bearing on Omidi's guilt or innocence. Friends, relatives, even total strangers may have their own, private reasons for seeking a defendant's exoneration. If they act on those reasons, they may be chargeable *in their own right*. But such third-party statements are irrelevant to the liability *of the defendant* unless there is a sufficient factual basis for attributing the threat to the defendant.

The Oxman statements were hearsay as well. This Circuit considers the "matter asserted" by a statement to include "*both* matters directly expressed and matters the declarant *necessarily implicitly intended* to assert." *United States v. Torres*, 794 F.3d 1053, 1061 (9th Cir. 2015). Here, the implicit message of the "gun-to-the-head" threat was, "You were part of an illegal enterprise and therefore would be damaging yourself if you cooperate with the government." That is total hearsay (as well as irrelevant)—unless, again, there were some legal basis for

63

attributing the Oxman statement to Omidi.  *See United States v. Rios*, 611 F.2d 1335, 1349 (10th Cir. 1979) ("Generally references to threats or danger to prosecution witnesses are improper unless admissible testimony is offered connecting the defendant with the threats or danger.").

According to the district court, the basis for such attribution was that Oxman was supposedly Omidi's agent at the time the statements were made.  30-ER-6045. To make that finding under Fed. R. Evid. 104(a), the district court was required to "undertake a fact-based inquiry applying common law principles of agency." *United States v. Bonds*, 608 F.3d 495, 504 (9th Cir. 2010).  Among other things, "an agency relationship exists only if both the provider and the recipient have manifested assent that the provider will act subject to the recipient's control and instruction." *Id.* at 507.

This Circuit's decision in *Bonds* illustrates the point.  There, the government brought a criminal perjury charge against Barry Bonds, alleging that he had used performance enhancement drugs and lied about it under oath.  The government proffered testimony from a drug testing lab employee that Bonds's former trainer (who refused to testify at trial) had told him that certain urine samples (which tested positive for performance enhancing drugs) came from Bonds.  *Id.* at 497. The government argued that the former trainer's statement could be used against Bonds because he was acting as Bond's agent when he identified Bonds as the

64

source of the samples. *Id.* at 504. In rejecting the government's position, this Court explained that the "essential ingredient" of agency "is the extent of control exercised by the employer." *Id.* at 505. In Bonds's case, the trainer had operated as an independent contractor; there was little to no evidence that Bonds exercised "control" of the trainer's conduct. Thus, even though Bonds had paid the trainer, showered him with gifts, and "spent considerable time" with him in San Francisco, this Court held that, without proof of "control," there was not a sufficient "agency" relationship to justify admitting the trainer's out-of-court statements against Bonds. *See id.*; *see also United States v. Cisneros*, 825 F. App'x 429, 433 (9th Cir. 2020) (vacating conviction where evidence failed to show that co-conspirator controlled defendant's actions).

The government's proof of Oxman's "agency" fell well short even of what this Court held insufficient in *Bonds*. The district court's finding was based entirely on these three facts: (i) Klasky had seen Oxman leave the building with Omidi shortly before the call was allegedly made (30-ER-6044); (ii) Oxman "at one time" had been a lawyer (30-ER-6044-45); and (iii) Oxman and Omidi had "work[ed] closely" together during the time Klasky worked at the company (30-ER-6045). Those three paltry facts could not possibly establish that Oxman and Omidi "manifested assent" that Oxman "will act subject to [Omidi's] control and instruction." *Bonds*, 608 F.3d at 507.

65

In view of the inflammatory nature of this evidence—including the trial court's refusal to give a limiting instruction to mitigate the worst implications of the gun-to-the-head threat (30-ER-6047-50)—the admission of the series of Oxman threats cannot be disregarded as harmless. *See Dudley v. Duckworth*, 854 F.2d 967, 970 (7th Cir. 1988) (excluding threat evidence that had no connection to defendant because it was an "evidential harpoon," and noting that some courts regard threat evidence to be so inflammatory "that an instruction to the jury to disregard it was not sufficient to expiate its effect").

## IV. THE FORFEITURE AND RESTITUTION AWARDS SHOULD BE REVERSED.

For the reasons set forth above, Appellants' convictions should be reversed, and along with them the forfeiture and restitution awards. But the orders and money judgment granting forfeiture and restitution are erroneous in any event and should be set aside.

### A. The District Court Erred in Awarding Forfeiture.

Before the trial court announced its forfeiture ruling, the defense had good reason for optimism. After all, the government consistently acknowledged that SCM's billings were not *all* fraudulent; that SCM's sleep studies were not *all* falsified; and that at least *some* SCM patients received treatments such as plastic surgery that did not involve sleep studies or Lap-Bands at all. *See* 53-ER-10640, ¶

66

261; 3-ER-630, 756 (estimating non-Lap Band surgeries accounted for 15% of billings); 3-ER-779.

Moreover, in denying restitution for the cost of Lap-Band surgeries, the district court found "that for at least some patients, their bariatric surgeon performed a physical examination and patient evaluation before surgery," and thus the surgery was medically necessary, regardless of any associated sleep study falsity. 1-ER-18-19. The district court further observed that the government had made "no effort to isolate payments for surgeries in which the medical records reflect that the bariatric surgeon evaluated the patient and found that the surgery was appropriate," 1-ER-19, and concluded that it did not "stand to reason that out of hundreds of patients … who contacted 1-800-GET-THIN, ostensibly for weight loss procedures, and received lap-band surgeries, not one was so obese or had comorbidities such that the person qualified for lap-band surgery," *id*.

Despite these concessions and findings, the district court ordered Appellants to forfeit an amount ($98,280,221.44) equal to *all* revenue of *all* SCM businesses during the period of the alleged fraud scheme, 1-ER-22, 24,[15] including all revenue attributable to patients who received "other services" besides sleep studies and

---

[15] The government calculated the $98,280,221.44 amount by simply totaling all third-party deposits to five Omidi and SCM-controlled bank accounts during the period of the scheme, *i.e.*, from May 2010 through March 2013. 1-ER-22 (citing Dkt. 1799-1 at 3).

Lap-Band surgeries or "received surgeries and diagnoses that were appropriate," 1-ER-23. The district court's forfeiture judgment should be reversed because the government failed to prove that the payments for legitimate services, or even for Lap-Band surgeries of patients with falsified sleep studies, were obtained as a result of the fraud.

> **1. The government was required to prove that no revenue would have been obtained, directly or indirectly, by Appellants "but for" the commission of the mail and wire fraud offense.**

Following Appellants' convictions, the government sought forfeiture of the $98,280,221.44 solely under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), based exclusively on Appellants' mail and wire fraud convictions under 18 U.S.C. §§ 1341 and 1343. 1-ER-22 (citing Dkt. 1799 at 30).

Under Section 981(a)(1)(C), civil forfeiture encompasses "[a]ny property, real or personal, which constitutes or is derived from *proceeds* traceable to" certain crimes, including mail or wire fraud. 18 U.S.C. § 981(a)(1)(C) (emphasis added). In cases such as this one involving health care fraud schemes, forfeitable "proceeds" are limited to "property … obtained directly or indirectly, *as the result of the commission of the offense* giving rise to forfeiture." *Id*. § 981(a)(2)(A) (emphasis added).

Under Section 2461(c), the government may include in a criminal indictment notice of its intent to seek forfeiture under the civil forfeiture statute, and upon

68

conviction under the indictment, "[t]he court shall order forfeiture of the property as part of the sentence in the criminal case pursuant to … the Federal Rules of Criminal Procedure." 28 U.S.C. § 2461(c). In turn, the Federal Rules of Criminal Procedure provide that, "[i]f the government seeks forfeiture of specific property"—as it did here in seeking forfeiture of specific deposits into specific bank accounts during a specific period—"the court must determine whether the government has established *the requisite nexus* between the property and the offense." Fed. R. Crim. P. 32.2(b)(1)(A) (emphasis added).

The government argued below that "the requisite nexus" required it to show that Appellants would not have obtained the property *but for* the charged offense. 3-ER-749 (citing *United States v. Martin*, 2014 WL 221956, at *4 (D. Idaho Jan. 21, 2014) (collecting circuit cases)). Appellants accept for present purposes that "but for" is the appropriate construction of Section 981(a)(2)(A). It therefore fell to the government to prove, by a preponderance of the evidence, that, but for Appellants' purported commission of the mail and wire fraud offenses, $98,280,221.44 would not have landed in their bank accounts. *See United States v. Christensen*, 828 F.3d 763, 822 (9th Cir. 2015). As shown below, it wholly failed to do so.

69

**2. The government failed to show that all the revenue received by SCM was forfeitable.**

The government contended, and the district court uncritically accepted, that *all* funds received by SCM during the period of the mail and wire fraud scheme—including "even those proceeds from nonfraudulent proceedings between 2010 and 2013" (1-ER-23)—are forfeitable, because they supposedly all resulted from the operation of SCM's call center (1-ER-22). In the district court's view, "even if patients were redirected to other services or received surgeries and diagnoses that were appropriate, they were recruited through the call center as part of the overall fraudulent billing scheme, such that proceeds from all services at least indirectly resulted from the scheme." 1-ER-23.

Put another way, the district court reasoned as follows: (1) *all* patients supposedly came to SCM through the company's call center;[16] (2) *some* of those patients thereafter received falsified sleep studies; therefore (3) *all* payments received for *all* patients who came in through SCM's call center—including all payments for patients with legitimate diagnoses and Lap-Band surgeries or who received other untainted services—were "obtained, directly or indirectly, as a result of" the fraud.

---

[16] The government presented no evidence that this assumption is true, nor did the district court cite any. But we proceed, for argument's sake, on the premise that all SCM patients were in fact recruited through the call center.

70

This preposterous syllogism—termed by the district court "the call center scheme" (1-ER-22)—is no less absurd than positing that all of SCM's receipts were directly or indirectly the result of "the lobby scheme": All patients had to enter SCM's facilities through the lobby and check in at the reception desk, therefore payments for patients who received legitimate services "indirectly resulted" from fraud because they came in through the same lobby doors and checked at the same reception desk as patients whose claims were later falsified.

In either case, the government's theory would make sense *only* if having a lobby or running the call center was the "offense" on which Appellants were "convicted" and that "g[ave] rise to the forfeiture, *see* 28 U.S.C. § 2461(c) (providing that predicate for court to order forfeiture of property is that "the defendant is convicted of the offense giving rise to the forfeiture")—but it wasn't. The indictment did not even mention a "call center" in its description of "THE FRAUDULENT SCHEME" or otherwise. *See* FSI [2-ER-514], ¶¶ 37, 38(a)-(t), 39-42. The closest it came was alleging that "GET THIN aggressively promoted Lap-Band surgery through advertisements … encouraging potential patients to call '1-800-GET-THIN' and attend a presentation (often referred to as a 'seminar') about the surgery" and that "[b]efore patients attended a seminar, GET THIN obtained their insurance information, using that to determine whether the patients had bariatric coverage … and, if so, whether that coverage extended to out-of-

71

network providers like GET THIN." *Id.* ¶¶ 38(a) & (b). But there was no suggestion that the advertising, or the call center's welcome script or collection of patient information, constituted fraudulent conduct.

Nor did any of the trial evidence relied on by the district court or otherwise cited by the government come close to establishing that the call center's in-take procedures were *themselves* fraudulent. The fact that two witnesses testified that Omidi was "the 'ultimate decision maker' regarding the call center" and "controlled SCM and other companies," 1-ER-23, does nothing more than identify Omidi as having managerial authority. And testimony that Omidi exercised that authority to have the call center seek to "redirect people who contacted the call center and did not qualify for lap-band procedures to other services offered by his business," such as plastic surgery, *id.*, does nothing to show that the call center was itself fraudulent. The government also cited evidence that "from a patient's first phone call," the call center collected information on insurance coverage from patients, their "basic medical history, and information such as height and weight" (3-ER-629). But there is nothing unusual, let alone fraudulent, about asking such typical patient in-take questions, and the district court understandably made no mention of it in its decision (*see* 1-ER-16).

The government's case for forfeiture fares no better when measured against the "requisite nexus" it conceded it had to prove—that the property would not have

72

been obtained "but for" the offense. *See supra* p. 69. That required the government to prove that SCM would not have obtained the concededly legitimate payments it received "but for" the fact that it submitted falsified sleep studies for a different set of patients. The government did not even pretend to meet that standard. Instead, it simply asserted that SCM would not have been able to provide and bill for legitimate services to some of its patients *"but for" the fact that those patients were first recruited to the practice through the call center*. *See* 3-ER-625-28. But again, the claim that all new patients first passed through the call center was not "the offense giving rise to forfeiture"; was not charged as part of the fraud scheme; and was not proved to involve a single fraudulent representation.

This Court's decision in *United States v. Prasad*, 18 F.4th 313 (9th Cir. 2021), on which the district court relied (1-ER-23), illustrates just how wrongheaded the "call center theory" is. Prasad was convicted of submitting falsified H1-B visa applications for foreign workers and then collecting wages that third parties paid to employ the workers. *See* 18 F.4th at 316-17. Prasad argued that the wage payments were not subject to forfeiture because they were obtained in legitimate commercial transactions, namely, the hiring out of workers at market rates. *See id.* at 325. Rejecting that argument, this Court held that the wage payments Prasad received were obtained as a result of the commission of the

73

offense of making false statements in visa applications, because without the fraudulent visa applications, the foreign workers would not have gotten into the country in the first place and Prasad would not have been able to hire them out. *See id.* at 326. This case presents exactly the converse circumstance: Here, the initial step—coming to SCM through the call center—was *un*charged and lawful, and only thereafter were some (but scarcely all) patients steered in an allegedly unlawful direction.

Why did the government resort to this absurd "call center theory"? It did so because it could not establish "but for" causation in the fashion required by law. Take the Lap-Band payments, for example. The district court itself declined to award restitution on account of Lap-Band payments because it recognized that bariatric surgeons had conducted independent medical examinations of patients before performing the surgeries, and thus some significant percentage (and perhaps all) of the Lap-Band payments were medically necessary, regardless of any associated false AHIs. 1-ER-19. As the trial court noted, the government "made no effort to isolate payments for surgeries" when such evaluations showed "surgery was appropriate." *Id.* Thus, based on the district court's own findings, the government did not establish but-for causation for those patients who were cleared for surgery by bariatric surgeons. Because that finding negated "but for" causation for some $30 million out of the total $98 million in proceeds received by

74

GET THIN (3-ER-557), there was no "but for" basis for forfeiting every dollar the company received.[17]

Nor could the government have met the "but for" standard with respect to 100% of the sleep study reimbursements. The fact that the results of some sleep studies were altered in claims that were later submitted for other services has nothing to do with whether it was medically necessary and appropriate to conduct and bill for the sleep studies in the first place. And here, the sleep studies were ordered by physicians as medically necessary. *See* 4-ER-894 (Dr. Madan directing that sleep studies be ordered for all Lap-Band surgery candidates to screen for OSA); 18-ER-3673 (government expert Dr. Norman rejecting government's suggestion that it would be "outside the standard of care to require that all patients approved for weight loss surgery undergo a PSG sleep study"). Hence the government's resort to the "call center theory."

As a fallback, the government asserted, without any evidentiary support, that SCM would not have received any payments for any legitimately billed or

---

[17] Moreover, as Rebecca Busch, an expert in health information management and medical audit, explained (without contradiction), sleep apnea was *never* listed as the primary diagnosis code in the 1,758 claims involving Lap-Band surgeries that she identified in the government's supporting data (3-ER-663-64, ¶¶ 4,6), and was listed as a second, third, or fourth diagnostic code in only 6% of those claims (*Id.*, ¶ 7). A falsified apnea claim obviously cannot have been the "but for" cause of a coverage payment if it was not even received by the insurer.

medically necessary services "but for" the existence of the fraudulent scheme, because supposedly SCM could not have stayed in business without proceeds from fraudulent billings. 3-ER-750, 754-57. The government pointed to the fact that SCM had expenses for advertising, payroll, real estate, and taxes, *see* 3-ER-755, but it never attempted to quantify and compare the amount of those expenses with the amount of the legitimate billings, and thus provided no evidentiary foundation for its assertion that SCM was kept "afloat" by the proceeds of fraudulent billings.

Any notion that SCM's business would not have existed but for the supposedly "'fraudulent beginnings' of the entire operation" (3-ER-750) is impossible to square with the undisputed evidence that SCM had been operating for four years before Klasky initiated the alleged scheme in July 2010; the call center had been running for two years before that; and in those two years SCM had already generated more than $100 million. 47-ER-9374-75; 54-ER-10797-98, ¶¶ 4-6, 8. In short, there was and could be no evidence to support the government's contention that, but for the alleged fraud, SCM would have generated no proceeds at all.[18]

---

[18] The government sought to distract from the lack of supporting evidence by peppering its motion papers with claims that SCM was "permeated with fraud." 3-ER-663; 3-ER-737-38, 750-51, 758. In so doing, the government attempted to capitalize on the fact that, in denying a motion to suppress evidence seized under extremely broad search warrants, the district court had found that SCM was "permeated with fraud." 53-ER-10625, 10627-32. But as this Court explained in

Because the forfeiture award is unsustainable, it should be reversed.

## B. The District Court Erred in Ordering Appellants to Pay Restitution for Sleep Studies and CPAP Equipment

The district court committed reversible error when it ordered Appellants to pay $11,207,773.96 in restitution under the MVRA to eight insurers for sleep studies and CPAP equipment, for at least three independent reasons.[19]

### 1. The insurers are not "victims" under the MVRA and, therefore, are not entitled to restitution.

Restitution under the MVRA may be awarded only to an "identifiable victim." 18 U.S.C. § 3663A(c)(1)(B). A "victim" for purposes of the MVRA is a "person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, … any person directly harmed by the defendant's criminal conduct in the course of the scheme,

---

*United States v. Rutgard*, 116 F.3d 1270 (9th Cir. 1997), in rejecting a similar attempt to obtain forfeiture of all proceeds of a medical practice without proving that literally all of its billings were fraudulent, "permeated with fraud" is a doctrine used "to establish probable cause in the non-adversary context of an application for a search warrant," *id*. at 1290 (citing *United States v. Hendershot,* 614 F.2d 648, 654 (9th Cir. 1980)), and has no application in the forfeiture context. That "conclusory phrase," this Court held, "is too loose and indefinite a term to … constitute a finding by the preponderance of the evidence absent specific supporting evidence." *Id*.

[19] The district court also imposed a fine on SCM of twice the restitution amount—$22,415,547.92—pursuant to 18 U.S.C. § 3571(d). 1-ER-6. Because the restitution award was erroneous, the fine should likewise be vacated.

77

conspiracy, or pattern." *Id.* § 3663A(a)(2). "The Government bears the burden of proving that a person or entity is a victim for purposes of restitution." *Waknine*, 543 F.3d at 556; *United States v. Catoggio*, 326 F.3d 323, 328 (2d Cir. 2003) (district court erred in ordering restitution to unidentified victims).

The eight insurers identified as "victims" *sometimes* were the entities that paid claims, but in most cases the insurers merely served as plan administrators for self-insured employers that were the actual payers. As Anthem's witness explained, "*over half of the people that we say are Anthem insured are actually insured through their own employer.* The employer is at risk for all the money. Anthem simply administrates [sic] the plan on their behalf." 10-ER-1995 (emphasis added). Indeed, the government originally sought approximately $41 million in restitution for the eight insurers, but some $35.6 million of that amount was actually paid by self-insured employers. 58-ER-11793, ¶ 3. The government failed to identify any of the self-insured employers, and thus failed to meet its burden. *See Waknine*, 543 F.3d at 556; *see also Catoggio*, 326 F.3d at 328.

The district court erred when it accepted that the eight insurers were, nonetheless, "victims." Without citing the MVRA or any case law, the district court ruled that the "Government has met its burden to show that the insurers are 'victims' of fraud even when the insurers were administering employer-funded plans." 1-ER-21. But the evidence upon which the district court relied only

78

underscores that the insurers are not victims at all. *See id*. (citing Dkt. 1594 at 59 ("explaining that the insurer 'writes the check' but the employer ultimately pays the claim"); Dkt. 1827 at 55 & n.1 (noting that "Aetna paid" but is "contractually obligated to return the appropriate portion of any restitution back to plan sponsors"); Dkt. 1852-1 ¶ 5 (Anthem "must provide funds recovered, minus compensation and costs associated with its recovery services, to the employer plans.")).

Nor is it true, as the district court supposed, that the MVRA permits third-party administrators to stand in the shoes of employers. To the contrary, the MVRA expressly provides for a very narrow set of representational standing. In particular, a victim's representative may assert the real victim's rights *only* where the victim is "under 18 years of age, incompetent, incapacitated, or deceased." 18 U.S.C. § 3663A(a)(2). Under the *expressio unius* canon, the statute should not be read to provide for standing under any other circumstances, including for third-party administrators. *See TRW Inc. v. Andrews*, 534 U.S. 19, 28-29 (2001). The restitution order can and should be reversed for this reason alone.

> **2.    The government failed to prove "actual loss" because it never offered the Plans that defined which claims would not have been covered "but for" the fraud.**

As the district court noted, restitution under the MVRA is limited to a victim's "actual losses," determined by comparing "what actually happened with

what would have happened if [the defendant] had acted lawfully." *United States v. Bussell*, 414 F.3d 1048, 1061 (9th Cir. 2005). That determination required comparing the "true" facts of the claims to the coverage terms of the Plans that prescribed the terms of patient coverage. Only by examining the actual Plans could anyone tell whether, had the true facts been disclosed, moneys would not have been paid. 10-ER-1995 ("Q: So is it the employer then that decides what coverage their employees are going to receive. A: Yes."); 10-ER-2063-64 (agreeing that "specific health insurance contract language of the specific patient's health insurance contract would take precedence over any medical policy"); 1-ER-40 ("Q: …but if the employer plan is different, which one controls? A: If they were different, then the individual employer plan would control.").

With the one possible exception (which actually showed that the claim to which it related was covered even without the alleged fraud, *see supra* pp. 22-23), the government failed to offer any of these plans, and thus the district court had no lawful basis for determining whether any given claim would have been paid but for the alleged falsities. But no matter, said the district court; the "[t]rial testimony showed that insurers did not differentiate between their role as insurers and as plan administrators when explaining that they would not pay claims." 1-ER-21 (citing Dkt. 1594 at 59; Dkt. 1589 at 60; Dkt. 1628 at 150). But that just restates the problem. While the insurance witnesses, when answering the government's

80

questions, may not have differentiated between internal policy and the actual Plans, that doesn't change the fact that it is the Plans that determine coverage.  As each insurer witness explained, the Plans controlled whether claims should be paid, regardless of whether insurers routinely failed to consult those Plans and instead relied on their own potentially inconsistent policies when processing claims.  If the actual Plan would have covered a claim even if "true" facts had been disclosed, then the employer suffered no actual loss by paying the claim.

Because the government failed to offer all the actual Plans, no one can possibly say whether the claims would not have been covered if the insurers had received the "true" facts.  It follows that the government failed to meet its burden of proving the amount of "actual loss," and restitution should have been denied for that reason too.

> **3.    The district court erred in granting restitution where there was no causal connection to the offense or any criminal conduct.**

But the district court's fatal errors do not end even there.  Restitution cannot be awarded under the MVRA unless the victim is "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered [here, the scheme to defraud,] including … the defendant's criminal conduct in the course of the scheme."  18 U.S.C. § 3663A(a)(2).  The district court, however, awarded restitution for sleep studies and CPAP equipment based on

81

"conduct" that was at most only negligent and not "criminal" at all (much less charged as such in the indictment).

    **a.**   *Follow-On Sleep Studies*.  The district court erred in granting restitution with respect to every dollar earned from the follow-on sleep studies. The purpose of a second sleep study, sometimes referred to as a titration study, is to calibrate CPAP equipment for a patient with sleep apnea.  15-ER-3177.  The fraudulent scheme for which Appellants were convicted involved altering the results of some of the first sleep studies to show one of two things:  (1) sleep apnea where there actually was none, or (2) more severe apnea than there actually was. But awarding restitution for every dollar of the follow-on sleep studies founders on two independently fatal problems.

    First, because the Michael Zarrabi reports were inadmissible (*see supra* pp. 46-57), the government failed to prove, even by a preponderance of the evidence, that any individual patient did or did not have sleep apnea.  It was therefore error for the district court to conclude that *any* of the follow-on sleep studies was improper.  And given the very high correlation between obesity and sleep apnea, simple probability favors the inference that a second sleep study was indeed medically necessary in every case (or at least in a great many cases).

    Second, even if we assume that the Zarrabi Reports were all true (and that all the alterations were therefore false), that fact would still not justify restitution for

*all* of the second sleep study payments. If the first sleep study showed at least *some* degree of sleep apnea, the second study was medically necessary, *regardless of whether the defendants altered the results to claim more severe apnea than justified*. Here, at least 65 out of 359 initial sleep studies—even according to the discredited Zarrabi Reports—showed sleep apnea, without regard to any fraudulent alteration of the results. *See* 54-ER-10651-52, ¶ 18.

The district court, nonetheless, held that restitution was proper for *all* of these second sleep studies, even if they were medically necessary, because the "Government points to trial evidence that these follow up sleep studies were not being properly administered." 1-ER-20. The district court cited testimony by a government expert witness (Dr. Norman) that, in his experience, CPAP machines are "typically" used to perform titration studies, but it "appeared" that SCM sometimes used a different device called an auto-PAP machine. 15-ER-3178-80. We doubt this purported error rises even to the level of malpractice; but at worst it suggests only simple negligence on SCM's part. Because restitution must be predicated on the "offense" charged by the government or any "criminal conduct" in the course of the fraud scheme, conduct that is at most merely negligent cannot support the award.

    **b.** *CPAP Equipment*. The district court awarded restitution for payments for CPAP machines on the ground that "CPAP equipment was not provided in

83

accordance with generally accepted standards of medical care." 1-ER-20. The district court cited testimony by Dr. Norman that "generally accepted standards of medical care" required that patients prescribed a CPAP machine be given instructions on its use and follow-up monitoring by a physician to ensure they were using it properly. 15-ER-3172-73. But once again, that testimony did not even begin to establish a "harm" "directly and proximately caused by the offense" or any "criminal conduct" in the course of the scheme. By its terms, Dr. Norman's testimony would at most establish negligent conduct in connection with the prescriptions for CPAP machines—*if* it were coupled with testimony that SCM did not provide such instructions or follow-on care, which Dr. Norman did *not* give, *see id.* A failure to observe the standard of care may be grist for a malpractice case. But it does not give rise to criminal restitution.

84

## CONCLUSION

For the reasons stated, this Court should reverse the amended judgments and

the money judgment of forfeiture.

Dated:  November 21, 2023

FRIEDMAN KAPLAN SEILER
  ADELMAN & ROBBINS LLP

  *s/ Lawrence S. Robbins*
Lawrence S. Robbins
lrobbins@fklaw.com
Jeffrey C. Fourmaux
jfourmaux@fklaw.com
Priyanka Wityk
pwityk@fklaw.com
Alexandra Elenowitz-Hess
aehess@fklaw.com
7 Times Square
New York, NY 10036
212-833-1100

*Attorneys for Defendant-Appellant*
*Julian Omidi*

Elon Berk
eberk@crimlawla.com
GUROVICH BERK & ASSOCIATES
15250 Ventura Boulevard, Suite 1220
Sherman Oaks, CA 91403
818-205-1555

*Attorneys for Defendant-Appellant*
*Surgery Center Management, LLC*

85

4853-7321-4354.1

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)**   23-1719, 23-1941, & 23-1959 (Con.)

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[  ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[  ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature**   s/ *Lawrence S. Robbins*               **Date**   November 21, 2023
*(use "s/[typed name]" to sign electronically-filed documents)*

**Form 17**                                                                 *New 12/01/18*

4853-7321-4354.1

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  23-1719, 23-1941, & 23-1959 (Con.)

I am the attorney or self-represented party.

**This brief contains**  19,630  **words,** including  0  words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[X] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  s/ *Lawrence S. Robbins*  **Date**  November 21, 2023
*(use "s/[typed name]" to sign electronically-filed documents)*